# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Marriage of Debra N.*, 2013 IL App (1st) 122145

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE of DEBRA N., Petitioner-Appellant, and MICHAEL S., Respondent-Appellee. |
| District & No. | First District, Fourth Division<br>Docket No. 1-12-2145 |
| Filed | January 31, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A trial court's order modifying the parties' joint parenting agreement by awarding sole custody to respondent father was upheld on appeal, notwithstanding petitioner's contentions that the change was contrary to the recommendations of the court's appointed expert and the child representative, and was not in the child's best interests, since the trial court was not required to follow the recommendations of the expert or the representative, and based on the evidence of petitioner's interference with respondent's visitation and relationship with the child, the order was not against the manifest weight of the evidence. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-D-230529; the Hon. Jeanne Marie Reynolds, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Jerome Marvin Kaplan, of Chicago, for appellant. |
| | |
| | Pedersen & Houpt, PC, of Chicago (Lawrence W. Byrne, of counsel), for appellee. |
| | |
| Panel | JUSTICE PUCINSKI delivered the judgment of the court, with opinion. |
| | Presiding Justice Lavin and Justice Fitzgerald Smith concurred in the judgment and opinion. |

**OPINION**

¶ 1    Petitioner Debra N. appeals an order of the circuit court modifying the joint custody agreement that had been previously reached by the parties and awarding sole custody of their minor child, Aubrey, to respondent Michael S. On appeal, Debra argues that the circuit court's decision to modify the terms of the parties' custody arrangement and award sole custody of their daughter to Michael was against the manifest weight of the evidence. For the reasons set forth herein, we affirm the judgment of the circuit court.

¶ 2    I. BACKGROUND

¶ 3    Debra and Michael were married on August 18, 2003. The parties had one child during their union, Aubrey, born on March 8, 2004. On October 20, 2006, Debra filed a petition seeking dissolution of their marriage, citing irreconcilable differences. A judgment dissolving their union was subsequently entered on May 18, 2007. Incorporated into the divorce decree was a joint parenting agreement (JPA) that had been reached by the parties. Pursuant to the terms of the JPA, Debra and Michael agreed to share joint custody of Aubrey. Debra was named Aubrey's residential parent and Michael was awarded regular weekly visitation and alternating weekend visitation. The parties agreed to reside less than 40 miles away from each other to facilitate visitation.

¶ 4    Following the divorce, Aubrey resided in Vernon Hills, Illinois, with Debra and Debra's older son, Jared, a child from a previous relationship. They moved to Wadsworth, Illinois, in 2009. Debra did not remarry. Michael initially resided in the Chicago area. He remarried in October 2009, and moved with his new wife, Stacey, to Arlington Heights, Illinois. Stacey had a son, Jimmy, from a previous relationship, who also lived with them. Michael and Stacey also had a child together, Aidan. Debra's move to Wadsworth occurred shortly after Michael's move to Arlington Heights. Her new residence was 39 miles away from Michael's, narrowly falling within the residency requirements of the parties' JPA.

¶ 5    Following their divorce, the parties appeared frequently before the court, filing various pleadings seeking judicial intervention on issues pertaining to visitation and custody. As the

parties' relationship began to deteriorate and they began to appear more frequently before the court, Kathryn Somers was appointed to act as Aubrey's child representative pursuant to section 506(a)(3) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/506(a)(3) (West 2008)). In that capacity, Somers was responsible for representing Aubrey's interests while attempting to facilitate better interactions between her parents.

¶ 6       On January 10, 2010, Debra filed a petition for removal in the circuit court, seeking permission to remove Aubrey from Illinois and move to Texas. An amended petition was filed on May 4, 2011. In her filings, Debra indicated that she sought to move to Texas for employment reasons. Michael responded, objecting to Debra's request to remove Aubrey to Texas, and argued that Debra's motives for seeking removal were not motivated by employment opportunities since her company had no offices in Texas. Debra subsequently withdrew her petition, and when the parties appeared in court, she orally requested the court to consider her filing to be a petition requesting sole custody. In response, Michael urged the court to uphold the parties' agreement to share joint custody of Aubrey, but requested that he be named her primary residential parent.

¶ 7       The court subsequently presided over a trial regarding issues relating to the custody of Aubrey. It heard testimony from both parents as well as from other witnesses, including a court-appointed psychologist, a grade-school social worker, and Aubrey's teacher.

¶ 8       Doctor Sol Rappaport, a licensed clinical psychologist, was appointed to be the court's expert pursuant to section 604(b) of the Act (750 ILCS 5/604(b) (West 2008)). As the court's expert, Doctor Rappaport interviewed both Debra and Michael, observed their interactions with Aubrey and Aubrey's interactions with her stepbrother and half brothers, and prepared reports documenting his observations and opinions.

¶ 9       At trial, Doctor Rappaport testified that neither parent exhibited symptoms of significant psychological impairment but indicated that their relationship had a "high level of conflict." He noted that the parties have sought frequent court intervention and that Debra had obtained two orders of protection against Michael. Doctor Rappaport opined that a lot of the conflict between the parties existed because Debra and Michael had difficulties communicating effectively with each other and displayed a lack of trust toward each other. According to Doctor Rappaport, each parent has expressed the belief that the other parent has attempted to interfere with his or her relationship with Aubrey.

¶ 10      Notwithstanding the conflict, Doctor Rappaport opined that Aubrey was doing "pretty well" and was attached to both parents. Although she was not yet alienated from either parent, Doctor Rappaport found that Aubrey was "clearly aware" of the high level of conflict between her parents, and he testified that continuing conflict could have a detrimental impact on Aubrey's emotional and psychological well-being.

¶ 11      Doctor Rappaport examined some of the actions taken by the parties and classified some of Debra's behaviors as "problematic." For example, he opined that Debra's petition seeking removal was not entirely made in good faith and that "part of the reasoning behind it was to get away from Michael." Doctor Rappaport agreed it was "partially accurate" that Debra attempted to interfere with Michael's efforts to reschedule visitation times when he had to miss previously scheduled visits due to work-related travel. He agreed that she "should be

-3-

more flexible," but believed that "both of them play in the dynamic between them regarding this issue." Ultimately, Doctor Rappaport believed that Debra was "a little too enmeshed with Aubrey," but he did not believe that any of Debra's actions were intentionally designed to harm the relationship between Aubrey and her father.

¶ 12        Because of the conflict between the parties, Doctor Rappaport favored breaking the parties' joint custody agreement. He explained that joint custody increased the amount of contact that Debra and Michael had with each other and that sole custody would lessen the opportunity for Aubrey's parents to have conflict with each other. Because Aubrey has always lived with Debra, and there was some evidence that Aubrey was closer to her mother, Doctor Rappaport recommended that Debra be awarded sole custody of Aubrey and that Aubrey continue to reside with her mother. He also recommended that Michael get an increase in parenting time, explaining: "Michael has a lot to offer Aubrey" and that "any possible negative impact that Aubrey may pick up at mom's house about dad can be diminished by having a good relationship with dad."

¶ 13        Doctor Rappaport admitted that his opinion that Debra be awarded sole custody could change if there was evidence that Debra was making false claims against Michael or was engaging in behavior intentionally designed to alienate Aubrey from him. He acknowledged that courts are not required to rule in a manner consistent with his custody recommendations and that there have been prior instances where courts' custody determinations did not accord with his recommendations.

¶ 14        Lydia Scher, a counselor at Aubrey's school, provided testimony about her interactions with Aubrey and Aubrey's parents. Scher has observed and interacted with Aubrey regularly since Aubrey is enrolled in an after-school program that provides counseling and social support services designed to help children socially and academically. Scher testified that Aubrey is "a bright and lively girl," but that she becomes "very guarded" when talking about her parents or their divorce. Aubrey has mentioned that she wants to move to Texas and become a cowgirl.

¶ 15        Scher testified that she first met Debra on January 25, 2011. On that date, Debra approached her and reported that there had been a recent incident where Aubrey's stepbrother, Jimmy, had hit her on the behind. Scher told Debra that if she had concerns about inappropriate contact that Debra should contact the Illinois Department of Child and Family Services (DCFS). Debra responded that contacting DCFS was not an option because she had contacted them multiple times before. Because Scher was a mandatory reporter under DCFS guidelines, she felt compelled to conduct further investigation into Debra's claim. Scher talked to Aubrey and asked her several questions about the incident. Scher ultimately determined that the incident did not seem to place Aubrey in any harm and advised Debra that there was no basis to contact DCFS.

¶ 16        Scher testified that she has had conversations with both Michael and Debra about custody issues. Each parent wanted Scher to be aware of the conflict that existed with respect to their custody dispute. Neither parent, however, has been outwardly disparaging of the other parent in her presence. One specific conflict of which Scher did become aware involved a "Star of the Week" assignment that Aubrey had to complete for school in November 2011. Scher

testified that Debra contacted her and reported that Aubrey had worked on a poster at Michael's house, but that she was upset about the finished product. Debra told Scher that Aubrey made changes to her poster when she returned home, but that Aubrey was "still pretty upset" and "worried about it." Based upon Debra's comments, Scher approached Aubrey in school and asked her about the poster. Aubrey started crying and became "guarded" and "didn't really want to talk about it." Scher believed that Aubrey's discomfort stemmed from the fact that she appeared to be "conflicted over disappointing one parent over the other." Aubrey did indicate that she was worried that Michael would come to school and see the changes that were made to the poster.

¶ 17    Sheila Wells, Aubrey's teacher, also provided testimony about her observations of Aubrey and the interactions she has had with both parents. Wells testified that she became aware of the conflict that existed between Debra and Michael when the school hosted a meet-and-greet at the beginning of the school year. Since then, Wells has interacted with each of Aubrey's parents separately. She sends each parent copies of school paperwork and meets with them separately for parent-teacher conferences. Both parents have been actively involved in Aubrey's schooling.

¶ 18    Wells provided more detailed testimony about the "Star of the Week" incident. Wells explained that throughout the school year, each student is named the "Star of the Week," and as a result, the student can bring in pictures and make a poster about his or her likes and dislikes to show to the other students. On the week that Aubrey was named the "star" both Michael and Debra sent pictures to school. Debra, however, contacted Wells and requested that she not use any of the pictures sent by Michael in the "Star of the Week" activities. Wells, however, decorated her classroom door with the pictures sent by both of Aubrey's parents. When Aubrey brought her poster to school, Wells noted that the poster had been altered. There were white-outs and obvious new additions to the poster that depicted Aubrey's likes and interests. Notably the "s" in "brothers" had been whited-out even though Wells was aware that Aubrey had two half brothers and a stepbrother. Although Wells agreed that it was unusual, Wells believed that all of the information that was contained on the poster regarding Aubrey's likes and interests was accurate. When Aubrey came to school that morning, she did not appear to be upset and Wells did not observe any signs that Aubrey had been crying.

¶ 19    Wells classified Aubrey as well adjusted and a "very good" student. When Aubrey started the school year, she was very quiet, but has since warmed up and become more comfortable with Wells. Based on her observations, however, Aubrey is "more guarded" than other students with divorced parents. Wells believed that Debra and Michael need to "show Aubrey that they can get along together" because "she desperately needs to see that they can be in the same room and sit next to one another."

¶ 20    Stacey S., Aubrey's stepmother, married Michael in October 2009. She testified that Aubrey gets along "really well" with her son Jimmy, who is the same age as Aubrey, and explained that they "act like brother and sister. They play video games, they swim in the pool together, they go to the park together. They go to their friends' homes together, they play games together." She acknowledged, however, that Aubrey and Jimmy did have occasions where they fought and that they were disciplined with "time-outs." Stacey testified that

Aubrey also gets along well with her new half brother, Aiden. She likes to hold and hug her younger brother. Aubrey shares a room with him when she stays at their house.

¶ 21    Stacey was aware of the incident regarding Jimmy allegedly inappropriately touching Aubrey. Stacey explained that she, Aubrey and Jimmy were walking single-file up the stairs. Aubrey was in front, Jimmy was next, and Stacey was carrying Aiden, who was 18 months old, and was following the kids up the stairs. As the kids were walking, Jimmy "patted Aubrey on the butt a couple times" because he was trying to get Aubrey to move faster. Aubrey did not appear distraught and Stacey reprimanded Jimmy.

¶ 22    Stacey testified that it is evident that Aubrey "loves her father," but indicated that transitions between parents are difficult for Aubrey and she often appears "very sad." Stacey has been present on multiple occasions when Aubrey is transitioned between her parents and has witnessed conflicts and hostility on the part of Debra and her son. Stacey testified that Debra's 16-year-old son, Jared, has made offensive gestures to her during transitions and has spit in the direction of Stacey's car. Debra witnessed her son's actions and laughed. On another occasion, Stacey was 5 to 10 minutes late to deliver Aubrey to her mother as a result of traffic and weather conditions, and Debra was "livid" and began screaming at Stacey in front of Aubrey.

¶ 23    Although Stacey agrees that her husband and Debra need to communicate with respect to their daughter, she does not believe that Debra and Michael are capable of communicating and cooperating with each other. Currently, she has "no communication at all" with Debra and is "afraid" of her. Despite the problems that have arisen between Debra and Michael, Stacey believes that Debra "has a wonderful interest in her daughter" and "loves [Aubrey] very, very much." Nonetheless, Stacey believes that Debra has caused Aubrey to have "extreme emotional issues" and anxiety. Aubrey has expressed to Stacey that her mother "makes her do things and say things." On one occasion, Aubrey had gone on a trip to Minnesota when Michael had been told that she and Debra were going to Texas. Aubrey became "numb" when asked about her trip and explained that she "was not supposed to tell" Michael about the change in vacation plans. Stacey also noted that Aubrey "has a very hard time adjusting when coming from her mom's house." She explained that it "usually takes about a day-and-a-half for the real Aubrey to come out."

¶ 24    Stacey further testified that neither she nor Michael does or says anything to undermine Aubrey's relationship with Debra and that they have made efforts to ease conflict. For example, Stacey and Michael have invited Debra and Jared over to their house, but Debra has rejected their offers. Instead, Debra has continued engaging in hostile and harmful behavior.

¶ 25    Michael and Debra both provided extensive testimony about the conflicts that have continued to exist between them as well as their relationships with their daughter. Michael testified that he has had to use the court system frequently in order to address a number of conflicts pertaining to the custody of Aubrey. The list of problems that Michael identified includes: visitation interference, transition problems, participation in Aubrey's schooling, Debra moving 39 miles away when he moved to Arlington Heights to be closer to his daughter, Debra seeking removal to Texas, Debra's refusal to permit extra parenting time

during school breaks, Debra's failure to include Michael's name on registration forms, Debra's failure to identify Michael as one of Aubrey's emergency contacts, Debra's attempts to alienate Aubrey from him, Debra's efforts to preempt Michael's plans with his daughter, disagreements over Aubrey's extracurricular activities and her participating on summer camps, the "Star of the Week" incident, and the orders of protection.

¶ 26    Michael detailed ways in which he believed that Debra has intentionally attempted to undermine his relationship with Aubrey and has sabotaged specific plans that he made with his daughter. As examples, Michael cited instances in which he had plans to take Aubrey to see Disney on Ice and watch movies such as "The Tooth Fairy" and "The Muppet Movie" but Debra took Aubrey to see the shows days before Michael was to do so.

¶ 27    He also provided testimony about two orders of protection that Debra obtained against him. The first order of protection that Debra obtained was issued in December 2007. Michael testified that he was scheduled to have visitation with his daughter on Christmas, but he agreed to delay his parenting time with Aubrey until December 27, 2007, so that Debra could travel with Aubrey to visit her parents. Debra did not arrive back in Chicago when she was scheduled to; rather, she delayed her return trip and did not provide Michael with any specific details. As a result, Michael testified that he repeatedly called Debra's cell phone to find out more information, but she never answered his call. Debra did not contact Michael when she and Aubrey arrived back in town. Instead, she sought an order of protection, citing telephone harassment as the reason for her request. The order of protection was dismissed within 10 days. Debra obtained a second order of protection in 2009. At that time, Michael and Debra disagreed about Aubrey's participation in a cheerleading event during a weekend that Michael was scheduled to have visitation. Ultimately, Michael drove to meet Debra in a McDonald's parking lot, the agreed upon transition location, to pick up his daughter. He walked up to Debra's car and opened the door to get Aubrey out of her car seat. Debra was next to him and they bumped into each other as Michael was getting their daughter out of the car. Debra subsequently filed an assault charge against Michael later that night. She requested that police go to his house and remove Aubrey from his residence. Michael testified that he was subsequently arrested and that Aubrey was taken from his house around midnight. Michael incurred significant legal fees to defend himself against Debra's assault claim and was adjudicated "not guilty"; however, Debra obtained an order of protection. The order of protection was subsequently extended, but was ultimately terminated. Aubrey was never named a protected party in the order of protection.

¶ 28    Michael testified that many problems have arisen between the parties regarding transitions and that court intervention has been necessary to diminish the contact and conflicts between him and Debra at pickups and drop-offs. In his own effort to remedy the situation, Michael testified that he enrolled Aubrey in an after-school program on the dates on which he was scheduled to have visitation, which allowed him to pick up his daughter directly from school. Debra, however, unilaterally cancelled Aubrey's enrollment in the program. Debra used her order of protection to change the pickup and drop-off location to the police station rather than Aubrey's school.

¶ 29    Michael cited lack of communication as another problem and source of conflict between the parties. He testified that once Debra obtained the orders of protection, the court ordered

-7-

that all communication between the parties go through their respective attorneys or through the court. To abide by the court's order, Michael explained that he and Debra obtained subscriptions to "Family Wizard," a communication service. Debra, however, intentionally let her subscription to the service lapse from June 2011 to September 2011, making it impossible for the parties to communicate directly with each other without violating the court's order.

¶ 30    Michael also provided testimony about negative statements Debra has made to their daughter about him. He testified that once he took Aubrey to buy her mother candy for Valentine's Day, and the next time Aubrey saw him, she told him, "Mommy threw it away and said you probably did something bad to it." On another occasion, Aubrey reported that Debra had said that she wanted Michael to "go away." Aubrey also told her father that Debra had said that Michael would not be able to drive and visit her when they moved to Texas.

¶ 31    Debra also testified at length about the conflicts that have arisen between herself and Michael regarding the care of their daughter and provided explanations for the events and behaviors that Michael described as being evidence of her attempts to alienate Aubrey from him.

¶ 32    When asked to explain the circumstances surrounding the 2007 order of protection, Debra testified that Michael had agreed to let her take Aubrey to visit her parents over the holidays even though the terms of the JPA provided that he was entitled to spend time with Aubrey over Christmas. Debra testified that they did not have an agreement that required her to be back by December 27, 2007. Based on her recollection, Debra sent a text message to Michael about their travel plans. When she returned home, Debra sought an order of protection because Michael made numerous phone calls to her while she and Aubrey were out of town. Although the order of protection was filed *pro se*, Debra claimed that it had been drafted by her previous attorney, but that he had not wanted to appear before the court on the matter.

¶ 33    Regarding the 2009 order of protection, Debra confirmed that she and Michael had a disagreement over Aubrey's participation in a cheerleading event during one of Michael's parenting weekends and testified that Michael refused to allow her to attend. Thereafter, at the transition location, Michael exited his vehicle and approached hers. Debra indicated that this was unusual since Michael did not usually get out his car during drop-offs or pickups. Both she and Michael then attempted to unbuckle Aubrey, but Michael shoved her, removed Aubrey from the car and then left. Debra confirmed that she filed criminal charges against Michael and insisted that police remove Aubrey from his home. She further confirmed that she received an order of protection following this incident but that Aubrey was never identified as a protected person in the document.

¶ 34    Debra acknowledged that she let her subscription to Family Wizard lapse even though this was the only way she could communicate directly with Michael about Aubrey pursuant to the terms of the order of protection She explained that she could not afford the subscription cost, which was approximately $100 annually. She was impeached by her financial statements, which showed that she had the funds to afford the subscription cost and that she let her boyfriend withdraw money from her account. Debra also acknowledged that

she helped make changes to Aubrey's "Star of the Week" poster, but explained that she did so because Aubrey was not happy with the poster when she returned from Michael's house. Although Debra admitted that she contacted Sheila Wells about the poster, she denied that she requested Aubrey's teacher not to include any of Michael's pictures in any "Star of the Week" activities.

¶ 35 Debra admitted to several other allegations made by Michael, but explained her actions as lapses in judgment or mistakes. For example, she admitted that she did not list Michael as one of Aubrey's emergency contacts on her school registration forms, but claimed that the omissions were not intentional and had been corrected. Debra also admitted to taking Aubrey to see movies when Michael had already made plans with Aubrey to take her, and acknowledged that she exercised poor judgment in doing so. In addition, Debra acknowledged that she has denied many of Michael's requests to change their visitation schedule to accommodate his work responsibilities, but explained that it became difficult to agree to all of his requests, and as a result, she has simply adhered to their previously agreed-upon visitation schedule set forth in the JPA.

¶ 36 Debra denied that her move to Wadsworth or her desire to move to Texas stemmed from improper motives. She explained that she elected to move to Wadsworth because that location offered more affordable housing and a better high school for her older son, Jared. Although the move took place shortly after Michael moved to Arlington Heights, Debra denied that her decision to move was designed solely to increase the distance between Aubrey and Michael. Debra also explained that her petition seeking removal was filed because she has extended family and a boyfriend who lived in Texas. Debra also indicated that she had a job opportunity there, but did not present any evidence about a specific job offer in Texas.

¶ 37 Debra also provided examples of objectionable behavior on the part of Michael. She testified that Michael once took Aubrey to get her hair cut without consulting her and that Aubrey returned home upset about her hair. After this incident, Aubrey's child representative requested that neither she nor Michael take Aubrey for a haircut without advising each other. Debra also cited the time that Michael took Aubrey on vacation to Disney World. Before they left, the parties agreed that Aubrey was to have daily phone contact with Debra while she was gone. Michael, however, violated their agreement. Although Debra acknowledged that she did receive a phone call from Aubrey while she was on vacation, she nonetheless contacted the child representative and informed her that she had not heard from her daughter and that Michael had violated their agreement.

¶ 38 After hearing the aforementioned testimony and reviewing the exhibits submitted by the parties, the trial court issued a detailed 37-page written order, severing joint custody and modifying the terms of the parties' JPA. The court explained its decision to sever joint custody, stating:

"There is no question that children are better off when their parents, despite a divorce, can achieve sufficient peace and harmony between them to cooperate effectively and jointly parent their children. Although it is clear that both parents love and want what he or she thinks is best for Aubrey, sadly this is not a case where the parents have been able

to achieve a modicum of cooperation, not to mention 'the high level of cooperation' necessary for joint parenting. *** The Court finds the evidence presented both since the parties [*sic*] divorce and through the trial demonstrate an inability to effectively communicate and joint parent."

¶ 39    The court then ordered that Michael be awarded sole custody of Aubrey. In explaining its rationale, the court made specific findings of fact as well as credibility determinations. In pertinent part, the court stated:

"The Court finds that much of Debra's testimony lacked credibility and many of the events she relayed were contradicted by the documents, testimony and other evidence submitted in this matter.

* * *

Debra continues to interfere with Michael's relationship with Aubrey. Debra has engaged in a pattern of interference and manipulation of Michael's relationship and her school activities, Michael's parenting schedule, vacation and holiday visitation. The Court finds that Debra has engaged in a pattern of action designed to diminish or eliminate Michael's ability to be a fully engaged and active parent. Debra has manipulated the terms of the JPA as well as engaged in a pattern of conduct designed to harass Michael, to limit his parenting time, summer, vacation and holiday time with Aubrey, and to potentially alienate Aubrey from a healthy relationship with her father and his family. Debra has taken on the role of gatekeeper as to Aubrey's schedule, and if not expressly written into the JPA, Debra refuses additional parenting time for Michael. Although Debra has more time with Aubrey than does Michael, she is inflexible about allowing Michael additional time. Debra refused to provide Michael with more than a few hours over Winter break. The fact that Aubrey has not yet been alienated does not mean the Court should ignore Debra's actions.

In weighing the best interests' factors as enumerated earlier, the Court finds that Michael [S.] is best suited to be the legal custodian of Aubrey [S.] and that it is in the best interests of the child that Michael [S.] be her legal custodian. Accordingly, Michael [S.] is awarded the sole custody of Aubrey [S.]"

¶ 40    Debra filed a motion to reconsider, which the trial court denied. This appeal followed.

¶ 41                                    II. ANALYSIS

¶ 42    On appeal, Debra challenges the order entered by the circuit court and argues that its decision to award sole custody of Aubrey to Michael was against the manifest weight of the evidence. She notes that the court's order was not consistent with the recommendation of Doctor Rappaport, the court's section 604(d) expert, or the opinion of Kathryn Somers, Aubrey's child representative, and argues that the court's decision did not accord with Aubrey's best interests.

¶ 43    Michael responds that Debra's challenge to the circuit court's order is without merit. He notes that the court carefully considered all of the testimony including the opinions offered by Doctor Rappaport and Kathryn Somers. Although the circuit court elected not to abide by

-10-

all of their recommendations, Michael maintains that the court's findings of fact and its ultimate decision to award sole custody of Aubrey to him were not against the manifest weight of the evidence.

¶ 44 Initially, we note that Debra's brief fails to accord with the requirements of Illinois Supreme Court Rule 341(h), which sets forth the requirements for appellant briefs. Ill. S. Ct. R. 341(h) (eff. July 1, 2008). As Michael observes, the "facts" set forth in Debra's brief are "interspersed with her argument" and "numerous items are stated as facts with no citation to the record." Although a party's failure to comply with Rule 341 is grounds for disregarding the arguments raised on appeal, it is not a limitation on this court's jurisdiction to consider the matter. *Burmac Metal Finishing Co. v. West Bend Mutual Insurance Co.*, 356 Ill. App. 3d 471, 478 (2005). We do not condone Debra's failure to comply with Rule 341; however, given that Michael has provided a summary of the relevant evidence in his response brief and the issues raised on appeal are simple, we will nonetheless consider Debra's challenge to the trial court's order.

¶ 45 "[C]ustody proceedings under the Marriage and Dissolution of Marriage Act are guided by the overriding lodestar of the best interests of the child or children involved." *In re A.W.J.*, 197 Ill. 2d 492, 497-98 (2001) (citing *Moseley v. Goldstone*, 89 Ill. App. 3d 360, 369 (1980)). When deciding issues pertaining to custody, the trial court has broad discretion, and its judgment "is afforded 'great deference' because 'the trial court is in a superior position to judge the credibility of witnesses and determine the best interests of the child.' " *In re Marriage of Bates*, 212 Ill. 2d 489, 516 (2004) (quoting *In re Marriage of Gustavson*, 247 Ill. App. 3d 797, 801 (1993)). Accordingly, a reviewing court will not disturb a trial court's decision to modify the terms of a custody agreement unless its decision is against the manifest weight of the evidence and constitutes an abuse of discretion. *Bates*, 212 Ill. 2d at 515; *In re Marriage of Smithson*, 407 Ill. App. 3d 597, 600 (2011). In determining whether a judgment is contrary to the manifest weight of the evidence, the evidence will be reviewed in the light most favorable to the appellee. *Bates*, 212 Ill. 2d at 516. If multiple inferences can be drawn from the evidence, a reviewing court will accept those inferences which support the court's order. *Id.*

¶ 46 Section 610(b) of the Act (750 ILCS 5/610(b) (West 2008)) allows for the modification of a prior child custody order under certain limited circumstances. It provides as follows:

"§ 610. Modification.

* * *

(b) The court shall not modify a prior custody judgment unless it finds by clear and convincing evidence, upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of entry of the prior judgment, that a change has occurred in the circumstances of the child or his custodian, or in the case of a joint custody arrangement that a change has occurred in the circumstances of the child or either or both parties having custody, and that the modification is necessary to serve the best interest of the child." 750 ILCS 5/610(b) (West 2008).

¶ 47 Accordingly, modification of a custody order is warranted only if there has been: (1) a change of circumstances and (2) modification is necessary to serve the best interests of the

child. *Smithson*, 407 Ill. App. 3d at 600. Section 602 of the Act, in turn, provides the following mandatory factors to consider in determining the custodial arrangement that is in the best interest of the child:

"§ 602. Best Interest of Child.

(a) The court shall determine custody in accordance with the best interest of the child. The court shall consider all relevant factors including:

(1) the wishes of the child's parent or parents as to his custody;

(2) the wishes of the child as to his custodian;

(3) the interaction and interrelationship of the child with his parent or parents, his siblings and any other person who may significantly affect the child's best interest;

(4) the child's adjustment to his home, school and community;

(5) the mental and physical health of all individuals involved;

(6) the physical violence or threat of physical violence by the child's potential custodian, whether directed against the child or directed against another person;

(7) the occurrence of ongoing or repeated abuse as defined in Section 103 of the Illinois Domestic Violence Act of 1986 [(750 ILCS 60/103)], whether directed against the child or directed against another person;

(8) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(9) whether one of the parents is a sex offender; and

(10) the terms of a parent's military family-care plan that a parent must complete before deployment if a parent is a member of the United States Armed Forces who is being deployed.

***

(b) The court shall not consider conduct of a present or proposed custodian that does not affect his relationship to the child.

(c) Unless the court finds the occurrence of ongoing abuse as defined in Section 103 of the Illinois Domestic Violence Act of 1986 [(750 ILCS 60/103)], the court shall presume that the maximum involvement and cooperation of both parents regarding the physical, mental, moral, and emotional well-being of their child is in the best interest of the child. There shall be no presumption in favor of or against joint custody." (Emphasis added.) 750 ILCS 5/602 (West 2010).

¶ 48    Here, after hearing six days of trial testimony, the court issued a comprehensive 37-page order, modifying the terms of the parties' prior custody agreement. Both parties agreed that the current custody arrangement was no longer tenable. While Debra sought sole custody, Michael argued that the parties should continue having joint custody of Aubrey but urged the court to modify the terms of the JPA and appoint him to be Aubrey's residential parent. In its order, the trial court agreed with the parties that their current JPA was no longer workable and required modification. Specifically, the court found that Debra and Michael had been unable to achieve " 'the high level of cooperation' necessary for joint parenting" and severed

-12-

joint custody.

¶ 49    The court then considered the best interest factors set forth in section 602 of the Act and ordered that sole custody of Aubrey be awarded to Michael. In making its decision, the court placed significant emphasis on the eighth best interest factor contained in section 602(a): "the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child." 750 ILCS 5/602(a)(8) (West 2008). The court found that this factor weighed "very heavily in Michael's favor" given that the evidence showed that "Debra has engaged in a pattern of action designed to diminish or eliminate Michael's ability to be a fully engaged and active parent."

¶ 50    In her challenge to the trial court's custody order, Debra relies heavily on the fact that the court did not follow the recommendation of Doctor Rappaport, whom the court appointed as its expert pursuant to section 604(b) of the Act. 750 ILCS 5/604(b) (West 2008). She argues that the court ignored Doctor Rappaport's "credible [and] uncontroverted" testimony when it awarded sole custody of Aubrey to Michael, rendering its decision against the manifest weight of the evidence. We disagree.

¶ 51    Section 604(b) of the Act "provides a mechanism for court appointment of an independent evaluator on custody and visitation issues. The purpose of the statute is to make the information available to assist the circuit court, and the expert witness is appointed to protect the interests of minor children regarding issues of custody and visitation." *Johnston v. Weil*, 396 Ill. App. 3d 781, 786 (2009). This section, in pertinent part, provides:

> "§ 604. Interviews. ***
>
> (b) The court may seek the advice of professional personnel, whether or not employed by the court on a regular basis. The advice given shall be in writing and made available by the court to counsel. Counsel may examine, as a witness, any professional personnel consulted by the court, designated as a court's witness." 750 ILCS 5/604(b) (West 2008).

¶ 52    Although it is within the court's discretion to seek independent expert advice, it is well settled that a court is not bound to abide by the opinions or implement the recommendations of its court appointed expert. See *In re Marriage of Saheb*, 377 Ill. App. 3d 615, 628 (2007) ("Nothing in section 604 requires the trial court to follow the advice of the 604(b) evaluator. Advice is simply that–advice. The trial court is the ultimate fact finder in a child custody case, not the expert witness."); *In re Marriage of Bailey*, 130 Ill. App. 3d 158, 160-61 (1985) ("Although the testimony of psychologists and social workers are relevant to the determination of custody, their opinions are not binding on the court.").

¶ 53    Accordingly, the mere fact that the trial court's custody determination did not correspond to the recommendation of Doctor Rappaport does not render its decision against the manifest weight of the evidence. *In re Marriage of Saheb*, 377 Ill. App. 3d at 628. Although Doctor Rappaport recommended that Debra be awarded sole custody of Aubrey, he never suggested that Michael was an unfit parent. In fact, Doctor Rappaport specifically stated that Aubrey was attached to both of her parents and that Michael "ha[d] a lot to offer Aubrey." In addition, Doctor Rappaport agreed that, in making its decision, some of Debra's behavior was "problematic." It is clear from the trial court's order that, in making its decision, it did

not "ignore" Doctor Rappaport's opinion, as Debra suggests. Rather, the court acknowledged that Doctor Rappaport recommended awarding sole custody of Aubrey to Debra, but correctly observed that it was not bound to implement all of his suggestions and specifically found that "awarding sole custody of Aubrey to Debra would allow Debra to further diminish Michael's relationship with Aubrey." Based on the record, the court's finding is not against the manifest weight of the evidence.

¶ 54 In the alternative, Debra argues that the court's order awarding sole custody of Aubrey to Michael is against the manifest weight of the evidence because it conflicted with the recommendation by Kathryn Somers, who had been appointed pursuant to section 506 of the Act to act as Aubrey's child representative. 750 ILCS 5/506 (West 2008). Somers was not called to testify, but she was present during the trial and delivered opening and closing remarks to the court. In her closing statement, Somers acknowledged that there was significant conflict between the parties; however, she indicated that she disagreed with Doctor Rappaport that the JPA should be modified. Rather, Somers recommended that the court keep "the status quo."

¶ 55 We find Debra's argument that the court should have adopted the position of Somers to be disingenuous given that she was the party who initially sought modification of the JPA and testified at length about the difficulties that have arisen between her and Michael as they have attempted to share joint custody of Aubrey. Moreover, pursuant to the express terms of section 506(a)(3) of the Act, the court is not required to implement the personal opinion of a child representative as the statute makes it clear that the role of a child representative is to provide the court with "evidence-based arguments," not personal opinions. 750 ILCS 5/506(a)(3) (West 2008) ("The child representative shall not render an opinion, recommendation, or report to the court and shall not be called as witness, but shall offer evidence-based arguments."); see also *In re Marriage of Bhati*, 397 Ill. App. 3d 53, 66-67 (2009) (finding that the trial court correctly struck the personal opinion of a child representative regarding the removal of a minor child because the opinion "was clearly improper pursuant to section 506(a)(3)" of the Act). Nonetheless, it is apparent from the court's order that it did consider the position advanced by Sommers, but found that the degree of conflict between Debra and Michael made their prior agreement to share joint custody unworkable and against Aubrey's best interests.

¶ 56 Ultimately, we are unable to conclude that the court's decision to award sole custody of Aubrey to Michael is against the manifest weight of the evidence. Although Michael did not specifically request sole custody, "[o]nce the issue of custody was placed before the court, the court possessed broad discretion to alter custody or visitation rights to the extent required by the child's best interests." *In re Marriage of Oros*, 256 Ill. App. 3d 167, 170 (1994). The trial court, after reviewing the extensive testimony presented in the case, found that Debra had engaged in "a pattern of interference and manipulation" designed to diminish Michael's ability to be a fully engaged and active parent and that Michael was best suited to be the legal custodian of Aubrey. Where, as here, the record supports the circuit court's finding that the custodial parent has made attempts to thwart the noncustodial parent's efforts to visit and maintain a close relationship with the child, the court's decision to modify the custody arrangement and transfer custody of the child to the noncustodial parent is not against the

manifest weight of the evidence and will be upheld on appeal. See, *e.g.*, *Mullins v. Mullins*, 142 Ill. App. 3d 57, 74-78 (1986) (affirming a circuit court order transferring custody of children to father where there was sufficient evidence to support a finding that the mother had engaged in a "scheme" to destroy the children's relationship with their father); see also *Naylor v. Kindred*, 250 Ill. App. 3d 997, 1016-17 (1993).[1]

¶ 57                                  III. CONCLUSION
¶ 58        Accordingly, we affirm the judgment of the circuit court.

¶ 59        Affirmed.

---

[1]Debra also argues that the trial court erred in denying her motion to reconsider. The motion, however, is not contained in the record on appeal. In her brief, Debra cites to a supplemental record, but no such record was ever filed with this court. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984) (holding that an appellant bears the burden of providing the court with a sufficiently complete record to allow for meaningful appellate review and that any deficiencies in the record will be resolved against the appellant). Notwithstanding Debra's failure to include the motion in the record, we are unpersuaded that the "newly discovered" evidence that Debra discusses in her brief warrants reversal of the circuit court's judgment.