NOTICE
Decision filed 11/01/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 220410-U

NO. 5-22-0410

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| SAMUEL ODER, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellant, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 21-F-161 |
| | ) | |
| KATELYN DUPUIS, | ) | Honorable |
| | ) | Alana I. Mejias, |
| Respondent-Appellee. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Justices Welch and Cates concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's allocation of parenting time and denial of the petition for relocation is affirmed where the decisions were not against the manifest weight of the evidence.

¶ 2    This appeal arises out of an order entered by the circuit court of St. Clair County that established paternity, allocated the decision-making authority over the child, allocated parenting time, and denied a petition for relocation of the child. Specifically, the petitioner, Samuel Oder, challenges the circuit court's allocation of parenting time and denial of his petition for relocation. For the following reasons, we affirm.

¶ 3                              I. BACKGROUND

¶ 4    The petitioner, Samuel Oder, and the respondent, Katelyn Dupuis, never married and are the natural parents of a daughter, R.L.O., born July 30, 2018, in Fayetteville, North Carolina.

1

Samuel initiated this matter on April 9, 2021, with the filing of a petition to determine the father-child relationship, petition for leave to relocate the minor child, and petition for allocation of parental responsibilities. On May 25, 2021, Katelyn filed a counterpetition for allocation of parental responsibilities and a response to Samuel's petition for allocation of parental responsibilities. A hearing on these petitions was conducted by the circuit court of St. Clair County on December 16, 2021. The following relevant evidence was adduced at the hearing.

¶ 5    Katelyn was the first witness to testify. She testified that she was presently employed by Pacific Rail Services and the Army Reserves. She works Monday through Friday from 7 a.m. until 3:30 p.m. for Pacific Rail Services. She lives in Caseyville with her fiancé, his five-year-old daughter, pursuant to his parenting agreement, their infant daughter, and her fiancé's father. They reside in a four-bedroom home.

¶ 6    When R.L.O. was born, Katelyn and Samuel lived in North Carolina. Katelyn and Samuel lived together for approximately two to three months before R.L.O. was born and continued living together for approximately six months after her birth. In January 2019, Katelyn moved to a different home in Fayetteville.

¶ 7    While living in North Carolina, Katelyn was employed as a bartender and waitress with working hours of 6 p.m. until 3:30 a.m. Katelyn testified that after she moved out of the shared home, she and Samuel shared time with their child equally. While Katelyn was working, R.L.O. was in Samuel's care and slept at his home. Katelyn testified that after she completed her work shift, she would arrive at Samuel's home by 6:30 a.m. She stated she would stay there while R.L.O. slept, and upon her waking, Katelyn and the child would then travel to her home. Once Samuel completed his work shift for the day, he would meet Katelyn at her place of employment to exchange R.L.O. This was the arrangement for the first year of R.L.O.'s life.

2

¶ 8    In August 2019, R.L.O. began sleeping at Katelyn's home. Samuel was at Officer Candidate School for the U.S. Military, a precursor to attending flight school, from August to September 2019. In October 2019, Samuel moved to Alabama for Army Flight School (flight school). Katelyn testified that she and Samuel discussed her moving to Alabama while he attended flight school, but ultimately, she decided to move to Illinois. Samuel completed flight school in December 2020. Due to attending flight school in a different state and restrictions in place by the military during the COVID-19 pandemic, Samuel did not exercise any parenting time with R.L.O. from October 2019 until March 2021.

¶ 9    In March 2021, Katelyn transported R.L.O. to Texas to stay with Samuel's parents for approximately one month. In April 2021, R.L.O. began living with Samuel in North Carolina. Katelyn testified that she allowed R.L.O. to be in Samuel's care to make up for the time he had missed with her. As of the December 2021 hearing, Katelyn had not been physically with R.L.O. since March 2021. However, she testified that she has used FaceTime to see and speak to R.L.O. every night. Samuel has made all decisions regarding R.L.O. since she has been living with him in North Carolina. Katelyn testified she expected that R.L.O. would return to live with her in Illinois in January 2022, but Samuel filed this action seeking the majority of parenting time and relocation of R.L.O.

¶ 10    Katelyn testified she has been a resident of Illinois since February 2020. She testified that R.L.O. has family living in Illinois including a half-sister, cousins, an aunt, an uncle, a grandparent, and a great-grandparent.

¶ 11    Katelyn agreed that since R.L.O. was born, she has moved a total of five times, and although she contributed to household expenses, her name was not on the lease. Katelyn testified it was her desire that R.L.O. return to Illinois and that she be allocated the majority of parenting

time. Katelyn and Samuel live approximately 12 hours from one another. Katelyn testified that she did not believe that driving to a halfway point to exchange the child was feasible and that air travel would be the way to transport the child between parents.

¶ 12    Katelyn was also questioned regarding a physical altercation between herself and her fiancé's ex-wife. Katelyn testified that she was attacked by the ex-wife, and she has since obtained a stalking/no-contact order against her that is still in effect.

¶ 13    Samuel was the next witness to testify. He testified that he was currently residing in Fayetteville, North Carolina, as he was stationed at Fort Bragg, North Carolina, and employed by the Department of Defense as a Department of the Army Civilian. Samuel has lived in North Carolina since 2017.

¶ 14    Samuel testified that he and Katelyn lived together from December 2017 through January 2019. Samuel testified consistently with Katelyn's testimony regarding their parenting arrangements once Katelyn moved from the shared home. They shared parenting time of the child around their work schedules, and the child slept at Samuel's home the majority of the time while Katelyn was working through the night.

¶ 15    Samuel testified that between January 2019 and August 2019, Katelyn was late to pick up R.L.O. in the morning approximately 8 to 15 times. He stated that this was due to Katelyn oversleeping or being too intoxicated to drive home. He also testified that Katelyn arrived at his home while intoxicated two to three times. As a result of Katelyn arriving late, Samuel was in turn late for work and was reprimanded by his supervisor.

¶ 16    Samuel testified that there have been periods of time that R.L.O. was not in his care. The first period was from August 2019 until September 12, 2019, while Samuel attended Officer Candidate School at Fort Rucker, Alabama. During this time, Samuel did not see R.L.O. except

4

for occasionally through FaceTime calls. Once he returned from candidate school, R.L.O. resumed sleeping at his home until he left for flight school. Samuel began attending flight school in Alabama in October 2019 and stayed there until December 2020. During this time, he only saw R.L.O. for Christmas 2019. He testified that his flight training schedule and the military's COVID-19 restrictions prohibited from seeing his child.

¶ 17    Samuel testified that Katelyn and he discussed her moving to either Alabama or Illinois. Samuel testified he offered to finance Katelyn moving and living in Alabama, but he did place stipulations on Katelyn's activities for that to take place.

¶ 18    After completing flight school in December 2020, Samuel returned to Fayetteville, North Carolina. He testified that he and Katelyn were discussing arrangements for R.L.O., and while he was making arrangements for daycare in North Carolina, the child stayed with his parents in Texas during March 2021. From April 2021 until the hearing, the child has been living with Samuel in North Carolina. While R.L.O. lived with Samuel, he made all decisions regarding the child and paid for all of her expenses. Samuel testified that R.L.O. came to live with him in April 2021 because he had not seen her for the past 17 months.

¶ 19    Samuel testified regarding the daycare that the child was attending and the schools she would have access to in North Carolina versus in Illinois. He also provided photographs of his home.

¶ 20    On December 29, 2021, the circuit court entered a 16-page order resolving all pending issues before the court. The circuit court found that paternity had been established and Samuel was the child's father. The circuit court found that it was in the child's best interest that Samuel and Katelyn be jointly awarded decision-making responsibilities for the child in all areas: medical, religion, education, and extracurricular. The circuit court determined it was in the child's best

interest that Katelyn be designated the parent with the majority of the parenting time. The circuit court denied Samuel's petition for relocation of the child.

¶ 21 Samuel filed a motion to reconsider on January 28, 2022, which was denied by the circuit court on June 1, 2022. A timely notice of appeal was filed on June 29, 2022.

¶ 22 Additional facts will be presented as necessary throughout the remainder of this order.

¶ 23                                              II. ANALYSIS

¶ 24                                   A. Allocation of Parenting Time

¶ 25 On appeal, Samuel contends the circuit court erred in its determination regarding the allocation of parenting time. He asserts a "clear review" of the record will demonstrate the decision was against the manifest weight of the evidence.

¶ 26 A court's decision with respect to the allocation of parenting time must be based on the best interests of the minor child. 750 ILCS 5/602.7(a) (West 2020). "Because the trial court is in the best position to assess the credibility of witnesses and determine the child's best interests, its decision regarding the allocation of parenting time must be accorded great deference." *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 15 (citing *In re Marriage of Debra N.*, 2013 IL App (1st) 122145, ¶ 45). A reviewing court "will not overturn the trial court's decision unless the court abused its considerable discretion or its decision is against the manifest weight of the evidence." *Id.* A decision is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence. *In re Marriage of Matchen*, 372 Ill. App. 3d 937, 946 (2007).

¶ 27 The circuit court in determining the best interests of the child for purposes of allocating parenting time must consider all relevant factors, including, without limitation, those listed in

6

section 602.7(b) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/602.7(b) (West 2020)). Section 602.7(b) lists the following nonexclusive factor list:

"(1) the wishes of each parent seeking parenting time;

(2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time;

(3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities or, if the child is under 2 years of age, since the child's birth;

(4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child;

(5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests;

(6) the child's adjustment to his or her home, school, and community;

(7) the mental and physical health of all individuals involved;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on parenting time is appropriate;

(11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household;

7

(12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs;

(13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(14) the occurrence of abuse against the child or other member of the child's household;

(15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender and, if so, the exact nature of the offense and what if any treatment the offender has successfully participated in; the parties are entitled to a hearing on the issues raised in this paragraph (15);

(16) the terms of a parent's military family-care plan that a parent must complete before deployment if a parent is a member of the United States Armed Forces who is being deployed; and

(17) any other factor that the court expressly finds to be relevant." *Id.*

Although a circuit court must consider all relevant factors when determining the child's best interests, it is not required to make an explicit finding or reference to each factor. *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43. We presume that a circuit court knows the law and follows it accordingly. *Id.*

¶ 28 Although it was not required to, the circuit court's order in this matter made written findings as to each of the 17 factors outlined in section 602.7(b). In the order, the court noted that the parties agreed to an arrangement regarding their daughter's care around their respective work schedules while they both lived in North Carolina. While Samuel attended candidate school in Alabama, R.L.O. was solely in Katelyn's care. Upon Samuel's return to North Carolina in

8

September 2019, the parties resumed their prior arrangement regarding R.L.O.'s care. In October 2019, Samuel moved to Alabama to attend flight school and R.L.O. was solely in Katelyn's care. Samuel completed flight school and returned to North Carolina in December 2020.

¶ 29    In February 2020, Katelyn and R.L.O. moved to Belleville, Illinois, and lived with Katelyn's mother and brother. At this time, Katelyn was solely responsible for R.L.O.'s care. In November 2020, Katelyn and R.L.O. moved to Caseyville, Illinois, and lived with Katelyn's fiancé, his daughter, and his father.

¶ 30    In March 2021, by agreement, R.L.O. moved to Texas for one month with Samuel's parents. In April 2021, by agreement, R.L.O. moved to North Carolina to live with Samuel to allow for makeup time with his daughter. During this time, Samuel was solely responsible for R.L.O.'s care.

¶ 31    The circuit court had no concern about either party's physical or mental health. The circuit court noted the parties exhibited very little conflict between each other and commended them for their cooperation following the hearing. Additionally, the circuit court found that each parent had shown they are willing and able to facilitate and encourage a close relationship between the other parent and the child.

¶ 32    The circuit court noted that R.L.O. is a three-year-old child. Samuel testified that R.L.O. has asked to go to "mommy" and that she missed Katelyn's fiancé and his daughter.

¶ 33    The circuit court found that the child has a fantastic relationship with both parents and noted in North Carolina the closest relative is Samuel's grandmother who lives approximately three hours away. In Illinois, R.L.O. resides with her mother, her half-sister, her mother's fiancé, his daughter, and four dogs and six chickens.

¶ 34    The circuit court found no evidence of physical violence or the threat of physical violence by either party against the child and no reason for a restriction on parenting time. There was no evidence of abuse against the child or other member of the child's household.

¶ 35    Ultimately, the circuit court found "after considering all the relevant factors outlined in 750 ILCS 602.7(b) that it is in the best interest of the minor child that Katelyn is designated the parent with the majority of the parenting time. If Sam moves within 25 miles of Katelyn, same will qualify as a substantial change in circumstances to request of modification of parenting time. If the parties lived in close proximity to each other the Court would award them equal parenting time with [R.L.O.]."

¶ 36    After carefully reviewing the record, we find that the circuit court's decision with respect to the allocation of parenting time was not against the manifest weight of the evidence, because that decision is supported by the evidence described above, and is not arbitrary or in any way unreasonable. See, *e.g.*, *In re Marriage of Matchen*, 372 Ill. App. 3d at 946.

¶ 37                    B. Relocation of Child

¶ 38    Samuel also argues the circuit court's decision denying his petition for relocation of the minor was against the manifest weight of the evidence. As with the allocation of parenting time, a court's decision as to relocation must be based on the best interest of the minor child. 750 ILCS 5/609.2 (West 2020). The best interest factors outlined under section 609.2(g) overlap, in many respects, with those set forth in section 602.7(b).

¶ 39    The circuit court's order made specific findings as to each of the factors set forth in section 609.2(g), even though Samuel's petition to relocate was untimely. Section 609.2 has certain conditions precedent to the filing of a motion to relocate. The statute clearly states that a parent who petitions to relocate a child must have been allocated equal parenting time or a majority of

10

parenting time in order to file a petition to relocate with the child. *Id.* § 609.2(b). When Samuel filed his petition for relocation there was no order in place regarding the allocation of parenting time, and thus he had never been allocated a majority of parenting time or equal parenting time and could not meet the statutory criteria for the filing of a petition to relocate the minor. For the foregoing reasons, we affirm the circuit court's ruling on this issue.

¶ 40                                    III. CONCLUSION

¶ 41    For the foregoing reasons, we affirm the December 29, 2021, order of the circuit court of St. Clair County.


¶ 42    Affirmed.