2020 IL App (1st) 191851-U

THIRD DIVISION
June 30, 2020

No. 1-19-1851

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| DARCEY R. BROGDON, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 17 D 8731 |
| | ) | |
| KEITH A. BROGDON, JR., | ) | Honorable |
| | ) | Karen J. Bowes, |
| Respondent-Appellant. | ) | Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Ellis and Justice McBride concurred in the judgment.

ORDER

¶ 1    *Held*:   The Judgment of the Circuit Court of Cook County is affirmed; the trial court's order setting a parenting time schedule and right of first refusal set forth in the Allocation Judgment was not an abuse of discretion nor did it result in a manifest injustice to the minor or respondent and respondent forfeited his arguments on appeal with respect to his motion to reconsider by failing to provide a complete record.

¶ 2    This appeal stems from a dissolution of marriage action between the parties and involves the trial court's rulings with respect to the weekday parenting time schedule between respondent and one of the parties' two minor children as well as the right of first refusal.  Following a trial limited to resolution of certain disputed parental responsibilities the trial court entered an

Allocation Judgment. The Allocation Judgment awarded parenting time to respondent with the parties' youngest child including one weekday dinner and a general right of first refusal invoked when a parent is away from the child overnight for non-work related reasons. Respondent filed a motion to reconsider the trial court's rulings on these two issues which the trial court denied. Thereafter respondent appealed arguing the trial court erred in (1) awarding respondent one weekday dinner with the child; (2) its application of the right of first refusal and use of language stating the provisions were agreed; and (3) denying respondent's motion to reconsider and request to file a reply to petitioner's response to the motion. For the reasons set forth below, we affirm the trial court's Allocation Judgment.

¶ 3                                    BACKGROUND

¶ 4     On October 12, 2017, petitioner, Darcey R. Brogdon, commenced this dissolution of marriage action involving respondent, Keith A. Brogdon, Jr., seeking relief including the adjudication of parental responsibilities with respect to the parties' two minor daughters born of the marriage, J.B. and K.B., respectively ages fourteen and eight at the time of trial. The following facts are relevant to respondent's appeal.

¶ 5     On August 7, 2018, Nicole Centracchio was appointed as the children's guardian *ad litem* (GAL). Prior to trial, the GAL prepared her Report of the Guardian *Ad Litem* (report) pursuant to section 506 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/506(a)(2) (West 2018)).

¶ 6     On March 5, 2019, this matter was set for trial commencing on June 18 and 19, 2019. The trial order provided for an *in-camera* interview with the children which was conducted on the first day of trial. An order was entered stating "the transcript from the *in-camera* interview shall be <u>sealed</u>, and not filed with the clerk of court." (Emphasis in original.)

¶ 7        On June 20, 2019, following a binding pretrial conference on financial issues, the trial court entered a Judgment for Dissolution of Marriage incorporating the parties' marital settlement agreement. The court also conducted a pretrial conference on parenting issues; however, no agreement was reached on the issue of parenting time with K.B. and the right of first refusal. A trial to resolve parenting time issues was subsequently conducted by the trial court. Prior to any witnesses being called, an order was entered stating "the report of the Guardian *ad Litem* stands as testimony and is admitted into evidence." Neither party objected to the entry of this order or the contents of the GAL's report.

¶ 8        For petitioner's case-in-chief, petitioner's counsel stated: "I stand on the guardian *ad litem's* report, and I stand on the 604-A interview the Court had with both children. And that's my case."

¶ 9        As part of her report the GAL interviewed petitioner, respondent, K.B., J.B. and Joanne Smith, a therapist working with the family. Statements made during these conversations were memorialized in the report. The GAL also made certain recommendations concerning parental responsibilities and noted that "there is little to no communication between the parties." With respect to the parenting time schedule, the GAL stated, "it seems that the current schedule is working between [K.B.] and [respondent]." She also recommended that respondent engage in personal therapy as "a requirement in moving forward, especially in navigating moving forward in his relationship with his children and with others in general." The GAL also hoped "that [K.B.] and [respondent could] continue to have a positive relationship, and that going forward he will not talk to her about any personal issues or court matters."

¶ 10        Respondent called petitioner as an adverse witness. Petitioner testified that over the course of their marriage she took care of the children most of the time and was a stay-at-home

mom. She ultimately became employed working nights in construction. While she was at work, respondent would be home with the children while they were all sleeping. He did prepare dinner for the children from time to time and the children would prepare their own breakfast in the morning.

¶ 11   Petitioner testified that after she attempted to obtain an emergency order of protection and left the marital home with the children respondent did see the children though she could not recall the exact dates and times of those visits. She informed respondent "he had every opportunity to [see the children]. He made the choice not to."

¶ 12   She testified her father provides care of the children from time to time and that "[h]e's more than happy to spend as much time as he can with his grand kids." She believed the schedule in place at the time of trial had "been working out" and was a fair schedule. She testified K.B. likes to spend time with respondent. However, she was opposed to respondent having overnight parenting time with K.B. during summer weekdays explaining that "he could not get her to the activities she had the following day" when he had K.B. on weekday overnights in the past. She was also opposed to respondent having an overnight on his Sunday parenting time during the summer.

¶ 13   Respondent was also called as a witness. He testified that prior to the filing of the dissolution action, he was employed working for a construction company. At that time, he would leave for work at approximately 5:30 a.m. and petitioner would return from her night shift around 6, 6:30 a.m. Petitioner would take the children to school in the morning and respondent would pick them up. Respondent testified he would also "get their dinner ready, get them ready for baths and whatever else." Petitioner would then leave for work at "7:00, 8:00, or 9:00 o'clock [at night] depending on what her start time was."

¶ 14    Respondent testified petitioner sought an emergency order of protection and left the marital home with the children around the time the dissolution proceedings were commenced. Though petitioner asked respondent to leave the marital home, respondent did not agree to leave but was ultimately ordered to do so.  Respondent testified that during the 60 to 65-day period following petitioner's attempt to obtain an emergency order of protection, he had telephone contact with the children but that it "started to wane" when petitioner was not answering his texts requesting the children call him.  He confirmed that petitioner offered him time with the children but he did not take advantage of that time because he "was afraid of doing anything that would jeopardize [him]" noting he was waiting to receive certain court-related documents from petitioner.  Respondent asked the children to come back to the marital home "over and over again[,]" "multiple times."  The children responded to these requests indicating "their mother would not let them."

¶ 15    Ultimately there was a parenting time schedule put in place in December 2017 but respondent stated he was not in agreement when it happened.  We note that the schedule referenced by respondent was entered pursuant to an agreed order (temporary parenting time schedule) and gave respondent alternating weekend time from Friday at 6:00 p.m. to Sunday at 7:30 p.m., a dinner every Tuesday and alternating Thursdays preceding petitioner's alternating weekend parenting time.  This temporary parenting time schedule was in effect at the time of the GAL's report and through the trial.

¶ 16    Respondent testified to various alleged inaccuracies in the GAL's report.  The majority of these inaccuracies related to statements made by others to the GAL which were memorialized in the report.  One such "inaccuracy" pointed out by respondent was the GAL's recommendation in the report that he not discuss court or money with K.B.  Respondent denied discussing court or

money with K.B. and pointed to K.B.'s statements to the GAL contained in the report that K.B. had never heard respondent say anything bad or discussing court or money.

¶ 17    At the time of trial respondent resided 2.2 miles from petitioner's residence and approximately 2.3 miles from K.B.'s school.  With respect to the parenting time schedule with K.B., respondent testified he wanted overnight parenting time on Wednesdays and Thursdays and alternating weekends from Friday to Monday.  Respondent also sought a right of first refusal that included work nights stating he "would like the ability to watch [K.B.], instead of [petitioner's] father or her son watching [K.B.]"  He was willing to help K.B. with her homework during his parenting time.

¶ 18    On July 3, 2019, the trial court entered the Allocation Judgment which provided each party with certain significant decision-making responsibilities.  The Allocation Judgment reserved parenting time between respondent and J.B. and included specific holiday, vacation, and regular weekday and weekend parenting time with K.B.

¶ 19    Pursuant to the holiday and vacation schedule for K.B., the parties are to alternate Labor Day weekend (from Friday at 6:00 p.m. until Monday at 6:00 p.m.); Thanksgiving (from Thanksgiving Day at 10:00 a.m. to Friday at 10:00 a.m.); the first and second halves of winter break which includes time over Christmas Eve and Christmas Day; Easter Sunday; Spring Break; and Memorial Day (from Friday at 6:00 p.m. to Monday at 8:00 p.m.).  Petitioner was given time on Mother's Day and respondent was given equivalent time on Father's Day.  Both parties were also given two weeks of summer vacation parenting time with K.B.

¶ 20    The regular weekend parenting time schedule with K.B. gives respondent parenting time every other weekend from Friday at 6:00 p.m. to the following Monday at 8:00 a.m.  Respondent also has weekday parenting time with K.B. every Wednesday from after school until 7:30 p.m.

Pursuant to the Allocation Judgment, petitioner is to have parenting time with K.B. at all other times.

¶ 21    The Allocation Judgment also includes a right of first refusal as follows:

> "Pursuant to 750 ILCS 5/602.3 and 750 ILCS 5/602.10(f)(14), the parties agree that if the parent caring for [K.B.] needs someone to watch her overnight for non-work related reasons, the parent needing the childcare shall notify the other parent via telephone or text message, and specify the period of time when the childcare is needed.  If the other parent responds within 24 hours and can provide childcare for the designated period of time, the parent needing the childcare shall provide transportation of [K.B.] to the other parent, and the parent caring for [K.B.] shall return her.  If the parent needing childcare does not hear back from the other parent within 24 hours, the parent[] needing childcare may seek childcare from a third party caregiver or babysitter."

¶ 22    On August 2, 2019, respondent filed a motion to reconsider arguing the trial court erred in applying the law with respect to his weekday parenting time with K.B. and the right of first refusal.  Respondent sought a rehearing and modification of the Allocation Judgment extending respondent's weekday parenting time from a Wednesday dinner to "overnight parenting time with [K.B.] on Wednesday and/or Thursdays of each week."  As to the right of first refusal, respondent argued it should include overnights for work-related and non-work-related absences rather than just the former.

¶ 23    On August 8, 2019, petitioner filed her response to respondent's motion.  On August 13, 2019, the date respondent obtained for presentment of his motion, the trial court entered an order

denying his motion and respondent's request to file a reply to petitioner's response.

Respondent's appeal followed.

¶ 24                                        ANALYSIS

¶ 25    On appeal, respondent argues the trial court erred in (1) not awarding him more weekday

parenting time with K.B.; (2) its application of the right of first refusal and use of language

stating the provisions were agreed; and (3) denying respondent's request to file a reply to

petitioner's response to the motion for reconsideration and denying the motion to reconsider.

¶ 26    A trial court's order allocating parenting time and implementation of a right of first

refusal is based on the best interests of the child and will not be reversed unless the order is

against the manifest weight of the evidence, is manifestly unjust, or the result of an abuse of

discretion. *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶¶ 21, 40.  Respondent

argues the trial court's parenting time order and right of refusal contained in the Allocation

Judgment were an abuse of discretion.  "[A]n abuse of discretion will be found only where the

trial court's decision is ' "arbitrary, fanciful or unreasonable" ' or ' "where no reasonable man

would take the view adopted by the trial court." ' "  *People v Illgen*, 145 Ill. 2d 353, 364 (2017).

An abuse of discretion will also be found "where the wrong legal standard has been applied.

*Zavell & Associates, Inc., v. CCA Industries, Inc.*, 257 Ill. 3d 319, 322 (1993).  A decision is

against the manifest wight of the evidence where the opposite result is clearly evident from the

record." *In re Marriage of Betsy M.*, 2015 IL App (1st) 151358 ¶ 61.

¶ 27    Before turning to the merits of this appeal, we address respondent's request that portions

of petitioner's responsive brief which he alleges are untrue or unsupported by the record be

stricken.  Upon careful examination of respondent's complaints, we find all but two are

unfounded.  We agree that there was no testimony that "[petitioner's] father was at home during

the night and [petitioner] fed, bathed and put K.B. to bed every night" during the period they resided with petitioner's father. Additionally, petitioner's statement concerning respondent's exercise of weekend parenting time following the entry of the Allocation Judgment is dehors the record and improper. Accordingly, these two sentences will be stricken from petitioner's responsive brief. See *Walters v. Rodriguez*, 2011 IL App (1st) 103488, ¶ 6 (Where a statement of facts does not comply with our supreme court rules "this court may *** strike portions of the brief"). We find that these flaws are not so serious as to interfere with our ability to understand and adjudicate this case but will not consider these assertions in our decision. See *State Farm Mutual Auto Insurance Company v. Burke*, 2016 IL App (2d) 150462, ¶ 22 (finding the flaws in appellant's brief did not interfere with the court's ability to understand and adjudicate its appeal but stating it would "ignore any material that is noncompliant with supreme court rules or that is unsupported by the record.").

¶ 28                          Weekday Parenting Time

¶ 29    Respondent argues the trial court misapplied the law when it failed to properly consider and weigh the section 602.7 factors when it allocated weekday parenting time and thus its ruling constitutes an abuse of discretion. Respondent also argues that the trial court's parenting time schedule with K.B. allotting respondent one weekday dinner was an abuse of discretion. We disagree.

¶ 30    Section 602.7 of the Act directs the court to "allocate parenting time according to the child's best interests." 750 ILCS 5/602.7 (West 2018). This section of the Act states:

> "(b) In determining the child's best interests for purposes of allocating parenting time, the court shall consider all relevant factors, including, without limitation, the following:

(1) the wishes of each parent seeking parenting time;

(2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time;

(3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities ***;

(4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child;

(5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests;

(6) the child's adjustment to his or her home, school, and community;

(7) the mental and physical health of all individuals involved;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on parenting time is appropriate;

(11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household;

(12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs;

(13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(14) the occurrence of abuse against the child or other member of the child's household;

(15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender ***; and

(17) any other factor that the court expressly finds to be relevant.

(c) In allocating parenting time, the court shall not consider conduct of a parent that does not affect that parent's relationship to the child." *Id.*

¶ 31 While a trial court must consider all relevant factors when determining the best interests of a child, explicit findings or references to each factor are not required. *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43. We presume the trial court knows and follows the law. *Id.* Additionally, in assessing testamentary evidence, we note that "[t]he trial court is in the best position to judge the credibility of the witnesses, and we will not supplant those credibility determinations on appeal." *Id.* at ¶ 45.

¶ 32 As to the trial court's decision in this case, respondent states the trial court "summarily decided the case without hearing from the GAL after evidence was testified to by [respondent] contradicting the GAL's report" and "conducted a trial without [plaintiff] establishing her case-in-chief and setting forth the relief she requested in her Petition for Dissolution of Marriage." Respondent's assertions are not supported by the record.

¶ 33 To begin, the trial court conducted an *in camera* interview with the children pursuant to section 604.10(a) of the Act which states:

"The court may interview the child in chambers to ascertain the child's wishes as to the allocation of parental responsibilities. Counsel shall be present at the interview unless otherwise agreed upon by the parties. The entire interview shall be recorded by a court reporter. The transcript of the interview shall be filed under seal and released only upon order of the court." 750 ILCS 5/604.10(a) (West 2018).

¶ 34    The transcript from the *in camera* was not made a part of the record. It was respondent's obligation as appellant to present a sufficiently complete record of the proceedings and where, as is the case here, the record is incomplete, any doubts which may arise from the incompleteness of the record will be resolved against respondent. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). In this case the *in camera* discussions could arguably have weighed heavily in the trial court's findings on nearly all of the section 602.7 best interest factors. On that basis alone, we find respondent has failed to demonstrate the trial court's parenting time order was an abuse of discretion because we do not have a complete record. See *id*.

¶ 35    After the *in camera* hearing, the court conducted a pretrial conference to resolve any disputed issues relevant to the allocation of disputed parental responsibilities. When the parties were unable to reach an agreement on certain issues, the trial court conducted a trial on the disputed matters.

¶ 36    The court heard from the GAL by entering its report into evidence. Section 506(a)(2) of the Act requires the GAL to investigate the facts of the case, interview the child and the parties, and testify or submit a written report to the court regarding her recommendations in accordance with the best interest of the child. See 750 ILC 5/506(a)(2) (West 2018). Neither party objected to the GAL's report being entered into evidence or to the trial court considering the content of

the report as testimony. Petitioner rested on that GAL's report as well as the 604.10(a) interview of the children.

¶ 37    Respondent, in his own case, provided testimony on these issues and called petitioner as an adverse witness. We note that respondent could have called the GAL as a witness but chose not to. After respondent concluded his case, the trial court rendered its Allocation Judgment. There is nothing in the record to demonstrate the court failed to consider the statutory factors. Thus, we presume the court followed the law and considered all the statutory factors. See *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43.

¶ 38    Indeed, after reviewing the record before us, we find the best interest factors support the trial court's parenting time award. We first point out that respondent's one weekday dinner parenting time cannot be viewed in a vacuum. Rather, it is only one component of a comprehensive schedule which provides respondent with alternating weekend time from Friday to Monday as well as holiday and vacation parenting time which respondent does not contest. With this in mind, we discuss the relevant best interest factors viewing the evidence in a light most favorable to petitioner and where multiple inferences can be drawn, accepting those inference which support the trial court's order. See *In re Marriage of Debra N. and Michael S.*, 2013 IL App (1st) 122145, ¶ 45.

¶ 39    With respect to factor one, the wishes of the parent, we note petitioner's testimony expressing her position that respondent should not have overnight weekday parenting time stating that this was consistent with how the parties had been doing things and it had been working out. In support of this position, petitioner noted respondent's failure to take K.B. to her activities following respondent's past weekday overnight time supporting the trial court's decision with respect to respondent's dinner weekend parenting time as opposed to an overnight.

While there was some testimony by respondent that he had taken K.B. to activities, he did not specifically address petitioner's concern's about K.B.'s activity attendance following his parenting time.

¶ 40    With respect to factor two, K.B.'s wishes and the weight to be ascribed based on the child's maturity and ability to express reasoned and independent preferences as to parenting time, as previously noted, this factor in particular must be weighed in favor of petitioner given respondent's failure to provide a complete record.  See *Foutch*, 99 Ill. 2d at 391-92.

¶ 41    Respondent argues the trial court did not consider factor three, the amount of time each parent spent performing caretaking functions in the 24 months preceding petitioner's filing of the dissolution action.  However, this argument is mere speculation because there is nothing in the record to support this allegation.

¶ 42    He argues that based on their work schedules prior to the dissolution filing, the trial court "could have essentially concluded that [respondent] had picked the children up from school and watched them more nights than [petitioner]."  That the trial court could have come to this conclusion does not mean that its decision is an abuse of discretion or its findings are against the manifest weight of the evidence.  Furthermore, we view the evidence in a light most favorable to petitioner and where multiple inferences can be drawn, accepting those inferences which support the trial court's order.  See *In re Marriage of Debra N. and Michael S.*, 2013 IL App (1st) 122145, ¶ 45.

¶ 43    Notwithstanding, the testimony at trial established that petitioner was home from 6:30 a.m. until 7 p.m., 8 p.m. or 9 p.m. depending on her start time.  Respondent testified that petitioner took the children to school every day.  While respondent testified he picked the

children up at the conclusion of school, got their dinner ready, and performed other evening care, petitioner testified that respondent would only make the children dinner from time-to-time.

¶ 44    Concerning factor five, the interaction and interrelationship of the child with her parents and siblings, petitioner testified that K.B. likes spending time with respondent. However, the GAL's report indicated there were issues with respondent's interactions and interrelationships which undoubtably impact K.B. The GAL's report stated:

> "I have *** on numerous occasions *** received emails from [respondent] *** generally saying that he is the dad therefore he should have unfettered time with the girls. He has also, through email, threatened to call the police to [petitioner's] house to enforce parenting time with [J.B.] without good reason. Again, this just bolsters the lack of understanding he currently has, and his willingness to take responsibility for his own actions. The blame falls mainly on [petitioner], but then now has trickled over to the GAL, the therapist and the court. I have never seen nor heard any evidence suggesting alienation by [petitioner] as [respondent] has alleged. [Petitioner] has encouraged the girls to visit, and in fact [K.B.] visits with [respondent] regularly."

¶ 45    The GAL's recommendations included respondent be required to engage in personal therapy "especially in navigating moving forward his relationship with his children and with others in general." While noting that K.B. and respondent have "a positive relationship" the GAL hoped "going forward [respondent] will not talk to her about any personal issues or court matters" as had been reported to the GAL. We note that respondent testified that he did not talk to K.B. about court or money, however, this does not mean the trial court found his testimony

credible and "we will not supplant those credibility determinations on appeal." See *In re Custody of G.L*, 2017 IL App (1st) 163171, ¶ 45.

¶ 46    In discussing the approximately 65-day period during which petitioner and the children left the marital residence following petitioner's attempt to obtain an emergency order of protection, respondent testified he remained in the marital home. Respondent testified he thought the children would come back during this period. He asked them to come back "over and over again[,]" "multiple times" but they told him "their mother would not let them." Regardless of the circumstances resulting in petitioner's attempt to obtain an emergency order of protection or whether it was justified, respondent's repeated requests to his daughters – ages twelve and six at the time – that they return home was inappropriate and highlights a lack of appreciation for the negative impact these discussions would have on them or how it placed them in the middle of the parties' dispute.

¶ 47    Furthermore, in her report, the GAL notes petitioner's statements that respondent's nephew had touched her inappropriately and questioned whether respondent believed this happened. The GAL's report also identified concerns with respondent's text communication with [J.B.] relating to a camp issue stating:

> "[Respondent] provided pages of text messages between himself and [J.B.] regarding this incident prior to coming in. He did not think that there was anything wrong with how he communicated with her in the texts. When I questioned him about whether he thought that he communicated with [J.B] in a manner that was more like they were peers versus father daughter, he didn't see anything wrong with it."

¶ 48    The GAL also includes J.B.'s statements to her exemplifying how respondent "tries to make her feel guilty about everything" stating:

> "[J.B.] and her sister went bowling with [respondent] one day, and he got angry about something, so he fell to the ground and cried, and had to go to the bathroom for 30 minutes to 'regain himself' in the bathroom, and she was left to sit with her younger sister [K.B.]"

¶ 49    The GAL's report also notes J.B.'s statements concerning K.B.'s relationship with respondent as follows:

> "[J.B.] said that [K.B.] has been crying and upset when she comes home from [respondent's care]. She said he tells her about things that are going on between him and [J.B.], and talks about money. He tells [K.B.] she is 'his only one' and that everyone is leaving him. She said he used to do that to her but now that she is not around he says the same thing to [K.B.] She thinks that [respondent] interrogates [K.B.] about why [J.B.] does not come to visit, and that [K.B.] is very sad and angry and feels put in the middle. She said [K.B.] has no[w] taken on the roll of 'fixer' and tries to fix the problems with [J.B.] and [respondent]. [J.B.] does not feel that is fair to [K.B.]"

¶ 50    This evidence supports the trial court's award of one weekday dinner to minimize the potential for added stress on the child during the week which might interfere with her school, camp, and other weekday obligations.

¶ 51    With respect to factor twelve, the willingness and ability of each parent to place the needs of the child ahead of his or her own needs, we note the GAL's report, wherein K.B. stated she "feels that [respondent] disregards her feelings for his own. And she feels like she is [K.B.'s]

babysitter when they are over at his place." The GAL's report also references her conversation with the family therapist who stated: "[K.B.] reported that Dad told her he is all by himself and there is no one to take care of him but her and he has cancer." The report further indicates that when the therapist confronted respondent with this information "[respondent then called K.B.] to interrogate her about what [the therapist] stated[.]" The GAL also reported the therapist stated "[respondent] has to be right about everything and he looks to his kids to meet his own needs." As with the previous factor, this evidence supports one weekday dinner to minimize the potential for added stress on the child during the week.

¶ 52    With respect to factor thirteen, the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, respondent argues petitioner has not facilitated the relationship between him and K.B. He cites petitioner's filing for an order of protection against him and keeping the children away from him for approximately 60 days as evidence of petitioner's inability to foster and encourage a relationship and her desire to minimize respondent's parenting time.

¶ 53    However, this is contradicted by both petitioner and respondent's testimony. Petitioner testified that respondent *did* see the children during this period and that she told him he had every opportunity to see them, but he chose not to. Respondent also acknowledged that petitioner had offered him time with the children but stated he did not take the time offered. Respondent further testified that petitioner facilitated telephone contact between him and the children during this period although he stated that it at some point it started to wane. As respondent points out, petitioner did not pursue a continuation of the order of protection. An agreed temporary parenting time schedule was ultimately entered although respondent testified he did not agree to the schedule at the time. The temporary parenting time schedule which was

marked as an agreed order gave respondent one weekday dinner and an alternating weekday dinner, but no weekday overnights.

¶ 54    Respondent cites to other dates where he claimed petitioner denied his requests to care for the children allowing her father to care for them instead.  However, we note that in her report, the GAL stated "[petitioner] has encouraged the girls to visit [respondent] and in fact [K.B.] visits with [respondent] regularly."  She also noted "I have neither seen nor heard any evidence suggesting alienation [of respondent] by [petitioner] as [respondent] has alleged."

¶ 55    The GAL's report also highlights petitioner's concern that respondent talks negatively about her to the children as stated in interviews with the GAL.  It is noted in the report from the GAL's interview with J.B. that respondent has said negative things about petitioner in front of [J.B.] and that she "feels like he tried to turn her against her mother."  She reported to the GAL that "his ring tone for [petitioner] is 'B**** Alert' and [J.B.] has heard it."  The report also notes J.B.'s statements that "her father brings up money in front of her [and that] *** she does not want to have to worry about her parent's finances."  This evidence also supports the trial court's parenting schedule providing for one weekday dinner and no overnights to minimize the potential for added stress on the child during the week.

¶ 56    We also address respondent's arguments that are not specifically tied to the section 602.7 best interest factors.  Respondent contends the trial court "decreased [respondent's] parenting time and infringed on his natural rights as a parent."  We disagree.  The Allocation Judgment provides respondent with more parenting time with K.B. than he had under the December 8, 2017 agreed temporary parenting time order.  Under that temporary parenting schedule, respondent was to return the children on alternating weekends at 7:30 p.m. on Sundays.  Under the Allocation Judgment, respondent now keeps K.B. through Monday morning – an additional

12.5 hours. We also note that because respondent is required to transport K.B. to school on Monday morning, an exchange between the parties is also eliminated during the school year. While the Allocation Judgment provides for only one weekday dinner, the additional 12.5 hours on alternating weekends provided for in the Allocation Judgment exceeds the amount of time respondent had on the alternating dinner under the temporary schedule.

¶ 57    Respondent argues the trial court misapplied the law "in light of the fact that the GAL recommended more time during the week [for respondent and K.B.] than [the trial court] awarded in its Allocation [J]udgment." We disagree with respondent. The GAL's report stated "it seems that the current schedule is working between [K.B] and [respondent.]" We point out that the temporary parenting time schedule did not provide respondent with weekday overnights. Moreover, while the schedule in the Allocation Judgment provides for only one weekday dinner and eliminated respondent's alternating weekday dinner under the temporary schedule, as noted above, the Allocation Judgment overall  provides respondent with more parenting by adding an overnight on respondent's alternating Sundays while reducing the transitions between the parties who do not appear to get along or cooperate.

¶ 58    There is nothing in the record to indicate the trial court failed to consider the statutory factors when it entered its parenting time order. We cannot say that no reasonable judge would enter the same allocation of parenting time order as the trial court or that the order constitutes a manifest injustice to the child or respondent. Therefore, we find no abuse of discretion and affirm the trial court.

¶ 59                                   Right of First Refusal

¶ 60    We turn next to respondent's argument the trial court's decision to only grant a right of first refusal for overnights and for non-work-related purposes was an abuse of discretion and

against the manifest weight of the evidence. For the reasons set forth below, we disagree the

trial court abused its discretion here or that the decision was against the manifest weight of the

evidence.

¶ 61    Section 602.3 of the Act allows the trial court to consider awarding a party the right of

first refusal to provide childcare for a minor during the other parent's normal parenting time

consistent with the best interest of the child as defined by section 602.7 of the Act. 750 ILCS

5/602.3 (West 2018). Section 602.3(b) of the Act explains how the right of first refusal is

implicated stating:

> "that if a party intends to leave the minor child or children with a substitute child-
>
> care provider for a significant period of time, that party must first offer the other
>
> party an opportunity to personally care for the minor child ***. If there is no
>
> agreement and the court determines that a right of first refusal is in the best
>
> interests of the minor child ***, the court shall consider and make provisions in
>
> its order for:
>
>> (1) the length and kind of child-care requirements invoking
>>
>> the right of first refusal;
>>
>> (2) notification to the other parent and for his or her response;
>>
>> (3) transportation requirements; and
>>
>> (4) any other action necessary to protect and promote the best
>>
>> interest of the minor child or children." *Id*.

¶ 62    In support of his argument the trial court's right of first refusal was an abuse of discretion

and against the manifest weight of the evidence, respondent cites petitioner's testimony as

follows: (a) that K.B. "likes to spend time with her father[;]" (b) that "when [petitioner] began working construction at night *** [respondent] prepared dinners for the children and was home with them[;]" and (c) that petitioner's father provides care for the children and is happy to spend as much time with his grandchildren as he can from which respondent concludes that petitioner "felt it better for her children to be in the care of their grandfather rather than their father[.]"

¶ 63    He cites his own testimony as follows: (a) that "he provided the care for his children prior to [petitioner] leaving the home and prior to the dissolution action as [petitioner] worked nights[;]" (b) that he lived within 2.3 miles of the school and insured that K.B.'s homework would be completed on school nights; (c) that "he suffers from lymphoma and underwent a Matched Unrelated Donor Transplant on May 19, 2016" and because of his cancer diagnosis and the resulting shorter life expectancy "it was his goal to maximize his time with his children for their social development[.]"

¶ 64    Based on this testimony, respondent concludes the trial court erred in "awarding the right of first refusal in such a way as it denies him the care of his daughter as the legislature intended when the other parent is unavailable." We disagree and find the right of first refusal in the parties' Allocation Judgment is not an abuse of discretion or against the manifest weight of the evidence.

¶ 65    Here, the right of first refusal is invoked where either party is away from the children overnight for non-work related reasons. As previously noted, respondent has failed to provide a complete record having omitted the transcript from the trial court's *in camera* interview with the children. On this basis alone respondent's arguments fail as any doubts which may arise from the incompleteness of the record will be resolved against respondent. See *Foutch*, 99 Ill. 2d at 391-92.

¶ 66    Notwithstanding, for all the reasons stated in our analysis of the trial court's parenting time order, we find the best interest factors support the trial court's award of the right of first refusal for only non-work related overnights.  Our conclusion here is further supported by the GAL's reported recommendations where she comments that the "current schedule is working between [K.B.] and [respondent]" – a schedule which we point out did not include a right of first refusal for work related reasons.  It is also clear that the parties do not get along and have difficulty cooperating.  A right of first refusal resulting in additional transitions and, thus, additional contact between the parties could "potentially lead to great conflict."  See *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 14.

¶ 67    Moreover, while petitioner's exact work schedule at the time of the trial is unclear from the record, it appears that her employment, at least prior to the filing of the dissolution petition, required petitioner to work nights from 7 p.m. to 9 p.m. depending on her start time to approximately 6:00 a.m.  There is nothing in the record, however, establishing how many nights a week petitioner worked and whether this was consistent throughout the year.  Nevertheless, given the trial's court parenting time schedule under the Allocation Judgment which we affirmed above, it seems petitioner's work schedule would regularly require invocation of a right of first refusal that included overnight work obligations upsetting the schedule found to be in K.B.'s best interests.  Requiring K.B. to be constantly transitioned in accordance with petitioner's work schedule would result in instability and inconsistency contrary to her best interests.  See *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 46 ("Stability and continuity are in the best interests of the child").  We cannot say no reasonable judge would enter the same order as the trial judge did in this case or that the order worked a manifest injustice on the child or

respondent. Thus, we conclude the trial court's right of first refusal award was not an abuse of discretion or against the manifest weight of the evidence.

¶ 68     As pointed out by respondent on appeal, the right of first refusal contained in the Allocation Judgment states the terms were agreed. However, the record confirms this was not the case. We believe this was an inadvertent scrivener's error and pursuant to our authority under Supreme Court Rule 366(a)(5) (Ill. S. Ct. R. 366(a) (eff. Feb. 1, 1994)) strike the words "the parties agree that" from the first sentence of paragraph P of the Allocation Judgment setting forth the right of first refusal and, as modified by this order, shall read as follows: "Pursuant to 750 ILCS 5/602.3 and 750 ILCS 5/602.10(f)(14), if the parent caring for [K.B.] needs someone to watch her overnight for non-work related reasons, the parent needing the childcare shall notify the other parent via telephone or text message, and specify the period of time when the childcare is needed. ***" See *Hough v. Mooningham*, 139 Ill. App. 3d 1018, 1021 (1986) (trial court's judgment modified on appeal to correct a non-substantive error of form pursuant to Supreme Court Rule 366(a)(5)).

¶ 69                                    Motion to Reconsider

¶ 70     Respondent filed a motion to reconsider the trial court's Allocation Judgment. On August 8, 2019, petitioner filed a two-page "boilerplate" admit/deny response to respondent's motion for rehearing that cited no case law but requested that the trial court deny respondent's motion to reconsider. The trial court denied respondent's request for time to reply to petitioner's response and denied the motion to reconsider.

¶ 71     Respondent argues the trial court erred in denying his motion to reconsider and request to file a reply to petitioner's response to the motion. The sole basis of respondent's motion to reconsider was his contention that the trial court "committed error in its application of the best

interest factors for his parenting time with [K.B.] as well as the right of first refusal as set out in 750 ILCS 5/602.3."

¶ 72    On August 13, 2019, the trial court entered an order after "being fully advised in the premises" denying respondent's motion to reconsider and request to file a reply to petitioner's response.  Respondent states in his brief "[t]he proceeding on the Motion to Reconsider in this case was very informal and improperly abbreviated" and "[t]he court erroneously did not afford respondent an opportunity to reply to [petitioner's] Response To the Motion To Reconsider filed on August 8, 2019."  He states "the Motion To Reconsider was only up for presentment on August 13, 2019 and the summary denial of it violated due process."

¶ 73    However, the record is incomplete with respect to the August 13, 2019 proceedings.  Respondent failed to provide a report of this proceeding, a bystander's report, or an agreed statement of facts.  Accordingly, respondent's arguments with respect to his motion to reconsider are forfeited.  See *Foutch*, 99 Ill. 2d at 391-92.  Moreover, we cannot say that no reasonable judge would have denied respondent's request for leave to file a reply to petitioner's two-page admit/deny response.  We note that even without forfeiture, based on the record and our analysis of the best interest factors as detailed in our discussion above, this court would not find the trial court erred in applying the existing law and thus denying respondent's motion to reconsider.

¶ 74                                    CONCLUSION

¶ 75    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 76    Affirmed.