NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (4th) 251351-U

NO. 4-25-1351

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 8, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| JESSICA M. PIERCE, | ) | Appeal from the |
|     Petitioner-Appellee, | ) | Circuit Court of |
|     v. | ) | Fulton County |
| JUSTIN M. WHITE, | ) | No. 23DC64 |
|     Respondent-Appellant. | ) | |
| | ) | Honorable |
| | ) | Bruce C. Beal, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Justices Zenoff and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, concluding, (1) the trial court's order granting the majority of parenting time to petitioner was not against the manifest weight of the evidence and (2) it was not error for the trial court to do so in the absence of a pleading from petitioner seeking such relief.

¶ 2    Respondent, Justin M. White, and petitioner, Jessica M. Pierce, dissolved their marriage in December 2023. Thereafter, in February 2024, Justin filed a motion for a modification of parenting time and responsibilities and a motion to restrict Jessica's parenting time. In November 2025, the trial court entered an order modifying the parties' parenting time, allocating the majority of parenting time to Jessica. Justin appeals the court's judgment, arguing the modification of the parties' parenting time in favor of Jessica was against the manifest weight of the evidence and it was error for the court to do so in the absence of a petition from Jessica requesting such relief. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                     A. Dissolution of Marriage and Original Parenting Plan

¶ 5            The parties were married in December 2018 and have one biological child together, A.W. (born March 2017). Jessica has a son, B.S. (born September 2011) and a foster child, A.C. (born September 2013). The parties, B.S., A.C., and A.W. lived together for some time, though it is unclear from the record for how long. On December 6, 2023, Jessica filed a petition for a dissolution of marriage. On December 19, 2023, the trial court entered a judgment of dissolution of the marriage and adopted the parties' agreed parenting plan wherein parenting time and decision-making responsibilities for A.W. were allocated equally. Parenting time was set on a three-day rotation between the parties (including school breaks), while holidays with A.W. were divided between the parties depending on the year.

¶ 6                               B. Jessica's Order of Protection

¶ 7            In 2023, Justin and Jessica each pursued orders of protection on several occasions. Ultimately, both parties, represented by legal counsel, reached a mutual agreement.

¶ 8            On January 30, 2024, Jessica sought another order of protection (Fulton County case No. 24-OP-18) on behalf of herself, A.W, and B.S against Justin. Jessica alleged Justin had followed her to a Dollar General store, called her vulgar names in front of the children, told her he was going to burn her to the ground, and warned her the next time she went shopping, she may want to watch her surroundings. After this incident, Jessica received multiple restricted phone calls, and when she answered it was Justin who proceeded to call her vulgar names. Further, she alleged Justin had been stalking her at home and at her place of employment. Two of her tires had been slashed, which she suspected had been done by Justin. The emergency order of protection was granted, prohibiting contact between the parties; however, Justin was still

allowed to receive his parenting time as outlined in the parties' original parenting plan.

¶ 9　　　　On March 28, 2024, a six-month interim order of protection was entered against Justin and in favor of Jessica in case No. 24-OP-18. Justin was prohibited from stalking and harassing Jessica and contacting her employer. All parenting exchanges were to be at the Fulton County Sheriff's Department, and the parties were to communicate via a parenting application regarding only the care of A.W.

¶ 10　　　　C. Justin's Motion to Modify Parenting Time and Responsibilities

¶ 11　　　　On February 14, 2024, Justin filed a motion to modify parenting time and to restrict Jessica's parenting time. In the motion, he alleged the parties had been residing together before and after the divorce. However, on Christmas Day, Jessica kicked Justin out of the house because "she was having an affair with her boss." He further alleged Jessica embarked on a campaign of denying him parenting time. Justin requested Jessica's parenting time be restricted and he be awarded sole decision-making authority because a substantial change in circumstances had occurred. Justin contended the following: A.W. disclosed witnessing sexual acts between Jessica and her new paramour; Jessica had created a Facebook account for A.W., who was six years old at the time; A.W. reported Jessica had smashed her tablet in retaliation for having filmed Jessica engaged in a sexual activity; A.W. returned to Justin's care on multiple occasions showing signs of physical neglect and abuse, including what appeared to be fingerprints and other bruises, dirt, and "extensive graffiti" on her body; and the January 30, 2024, order of protection prevented them from discussing or making joint decisions for A.W. Justin filed an affidavit attesting to these facts. In his request for relief, Justin requested the trial court "modify the Parenting Plan to have a specific parenting-time schedule in place for both parties" and for the court to "[o]rder other such other [*sic*] and further relief as is necessary or appropriate."

¶ 12        Justin also filed a motion for temporary relief alleging the same arguments in his motion to modify parenting time. In the motion for temporary relief, he further alleged due to the vague parenting schedule and emergency order of protection, enforcement of Justin's parenting time had been an issue. Justin felt it was in A.W.'s best interest for the original parenting plan to be modified to restrict Jessica's parenting time and sole decision-making authority be awarded to him on a temporary basis.

¶ 13        On March 13, 2024, Justin filed a petition for contempt alleging Jessica had "willfully and contumaciously" and "without compelling cause or justification" failed to comply with the original parenting order by denying his regular parenting time with A.W. and not allowing him electronic communication with A.W. Further, Justin asked the trial court to require Jessica appear before the court to determine if she was in contempt, punish her with a fine or imprisonment if found to be in contempt, have her pay Justin's costs and reasonable attorney's fees, and impose any other relief the court deemed necessary.

¶ 14        On May 6, 2024, Jessica filed a motion asking the trial court to appoint a guardian *ad litem* (GAL) to determine the best interest of A.W. The motion alleged she and Justin were parties to another case with a high level of conflict (case No. 24-OP-18), they were not likely to reach a resolution on this matter regarding A.W., and it would be in the best interest of A.W. for a GAL to be appointed. In September 2024, an agreed order was entered, appointing a GAL, Whitney Parrish.

¶ 15        In August 2024, Justin filed a proposed parenting plan granting him the majority of parenting time with A.W. In May 2025, he filed a motion for an *in camera* interview of A.W. and a motion to remove the GAL. In his motion to remove the GAL, Justin questioned her impartiality and noted she had been working on the case for seven and a half months without

filing a report. The trial court granted the motion for an *in camera* interview, over the objection of the GAL and Jessica's counsel, and denied the motion to remove the GAL.

¶ 16                              D. The Report of the GAL

¶ 17          In May 2025, the GAL filed her report outlining her findings and recommendations regarding a modification of parenting time and allocation of parental responsibilities between the parties. During her involvement in the case, she met with both parties, A.W., B.S., A.C., and other witnesses provided by both parties. She also reviewed documentation, mostly provided by Jessica, and attended court proceedings. She documented the following information.

¶ 18                    1. *Interviews with A.W. and Her Family Members*

¶ 19                              a. Jessica

¶ 20          The GAL met with Jessica in October 2024 who was employed at Triplett and Wood Funeral Home, where she worked from 8:30 a.m. to 4:30 p.m., with some occasional weekend or evening times as needed. She had been in a romantic relationship with the owner of the funeral home, Chris Triplett, since January 2024.

¶ 21          Justin and Jessica separated in January 2023, when A.W. was approximately five years old. The parties followed an agreed-upon parenting schedule from February 2023 to January 2024, exchanging A.W. every three days. In January 2024, after Justin found out Jessica was in a new relationship, things deteriorated. Jessica recounted the reasons for filing an order of protection. After it was granted, the parenting schedule remained the same, but the exchange location and communication provisions were altered.

¶ 22          In response to allegations in Justin's motion to modify parenting time, Jessica noted A.W. does not sleep in bed with her and her paramour. An investigation conducted by the

Illinois Department of Children and Family Services (DCFS) also determined any allegations of A.W. witnessing sexual acts between Jessica and Chris to be unfounded. In response to Justin alleging Jessica had allowed A.W. to have a Facebook account, she noted she did allow A.W. to create a profile, but it was private and all messages, requests, and posts went to Jessica's phone for review and approval. A.W. was communicating with Justin and other approved friends through Facebook Messenger. Regarding the allegation A.W.'s tablet had been smashed by Jessica in retaliation for filming her engaged in sexual activity, Jessica noted A.W. smashed her own tablet when she was not allowed to go to a Girl Scout meeting because Jessica had a meeting with a DCFS investigator (for the case Justin initiated based on the foregoing sexual allegations). In response to A.W. being returned to Justin's care showing signs of abuse and neglect, including bruises and extensive graffiti on her body, Jessica could only recall one incident where A.C. and A.W. had drawn on each other. Because Jessica's hot water heater had broken, she did not have a chance to wash it off, and she notified Justin of the graffiti before their parenting exchange.

¶ 23        Jessica was seeking the majority of parenting time with A.W. due to Justin not exercising his parenting time during the week and because of manipulation and parental alienation issues caused by Justin, which continued to worsen as the case progressed.

¶ 24                                b. Justin

¶ 25        In November 2024, the GAL met with Justin, who works for the United States Department of Agriculture. He rents a house from his sister, Maggie White, in Bader, Illinois (approximately five miles from Astoria, Illinois). Due to Justin's work schedule, which required him to leave in the middle of the night, A.W. spent a significant portion of Justin's parenting time with Maggie or the babysitter, both of whom live in Astoria. This would require A.W. to

spend the night at their respective houses so her sleep wasn't interrupted. They would then take A.W. to school.

¶ 26　　　　Justin insisted he and Jessica did not separate in January 2023. He claimed they were together throughout 2023, and Jessica kicked him out on Christmas Day in 2023 because she started dating her boss. Regarding the allegations he made in his motion to modify and restrict Jessica's parenting time, he claimed A.W. told him she had seen her mother on top of Chris "without clothes on and moving up and down." Justin had also found two Facebook accounts with A.W.'s name and picture. One of the profiles had sent him a friend request, but he never communicated with either of the profiles and was unsure if A.W. was still using them. He further claimed A.W. told him Jessica smashed her tablet because she recorded Chris and her in bed. He also noted he had bought A.W. a phone but did not allow her to have Jessica's number in it because she did not pay half the bill. If A.W. wanted to speak with Jessica, he would drive her to his sister Maggie's home, where she could use the phone to call Jessica. In response to finding bruising on A.W.'s body, he claimed it happened approximately five different times, and he took pictures to document it. He called DCFS and claimed A.W. told him the other children hit her.

¶ 27　　　　Justin sought the majority of parenting time, saying A.W. preferred living with him and accused Jessica of being mean and yelling. He also claimed Jessica missed some court-ordered parenting time and gave up several holidays to him. Although Justin did not have concerns regarding the living environment or household conditions, he believed Jessica was more concerned with her romantic relationship rather than caring for A.W.

¶ 28　　　　　　　　　　　　c. Maggie

¶ 29　　　　The GAL spoke with Maggie, Justin's sister, in January 2025. During Justin's parenting time, A.W. would ride the bus to her home after school, and Justin would pick her up.

She also provided childcare for A.W. when Justin worked, which was Monday through Friday. Sometimes A.W. would stay overnight at Maggie's house, and other times Maggie would go to Justin's house to watch her. Maggie also claimed to have A.W. during most of Jessica's parenting time in the summer of 2024. Maggie claimed A.W. would call her asking to get her from Jessica's home when they were not getting along. Maggie was the " 'go between' " communicator between Justin and Jessica because they could not get along.

¶ 30 A.W. confided in Maggie and claimed she was unhappy with both of her parents. A.W. told her she did not like going to Jessica's home because everyone is mean to her and hits her, although Maggie never saw evidence supporting these claims. She believed both parties loved A.W. very much but were not mature enough to coparent. She also felt the current parenting plan was not stable for A.W.

¶ 31 d. A.W.

¶ 32 Jessica brought A.W. to speak with the GAL in January 2025. A.W. was exchanged every three days between her parents' homes. Jessica spent a lot of time with Chris, which A.W. did not like. She wanted Jessica to spend more time with her. She also did not like the constant back and forth with the current parenting schedule. If given a choice, she would want to live with her father because there was no one else in the house, she got all the attention, and he bought her what she wanted. However, if Justin were to get a girlfriend, she would want to live with Jessica.

¶ 33 Justin also brought A.W. to meet with the GAL a second time in January 2025. The GAL noted she appeared disheveled, with stains on her shirt. When discussing Jessica and Chris, A.W. confirmed she had only ever seen them kiss—nothing more. She claimed she also saw A.C. smash her tablet with a bat. She also had TikTok on her phone because Justin said she

could. The GAL reviewed A.W.'s TikTok account, which was public, and noted several inappropriate videos, including ones sexual in nature and utilizing vulgar language.

¶ 34                                    e. Jessica's Other Children

¶ 35        In February 2025, the GAL also met with A.C. and B.S. A.C. liked living with Jessica and hoped to "stay [there] forever." She and A.W. played together and did each other's hair and makeup. Although A.C. and A.W. had their own rooms, A.W. liked to sleep in A.C.'s room. A.C. noticed A.W. was mean whenever she returned from Justin's house. She also claimed A.W. broke her own tablet when she was not allowed to go to a Girl Scout meeting. A.C. also found Chris to be very nice. She did not like Justin when he was living in the home and claimed he yelled at her and B.S.

¶ 36        A.W. told A.C. that she wanted to live with Justin because he loves her more, buys her more things, and does not have a girlfriend. A.C. thought Jessica should spend more time with them instead of in the bedroom with Chris.

¶ 37        B.S.'s interview was short due to him being uncomfortable. B.S. did not like Justin and found him to be mean. He did like Chris and found him to be kind.

¶ 38                                    f. Other Witnesses

¶ 39        The GAL also spoke with Chris over the phone in February 2025. He and Jessica had been in a relationship for about a year. Although they did not live together, Chris spent a lot of time at Jessica's home. He was the owner of four funeral homes, and Jessica had been working for him for over two years. Chris saw A.W. on a weekly basis due to the parties' parenting schedule. He witnessed an incident where A.W. kicked Jessica in the stomach, claiming Justin told her she could do it. On at least one occasion, Chris overheard a telephone conversation where Justin used vulgar language toward Jessica. He also witnessed an occasion

where A.W. punched Jessica in the face; Jessica responded by spanking her and putting her in the corner. A.W. then went outside and stated, "[M]y dad said you're a f*cking b*tch and deserved that."

¶ 40 The GAL spoke with Nicole Westlake, who had known Jessica and Justin for years. She has provided childcare for both parents. Although she had not cared for A.W. recently, she was willing to do so. Nicole knew A.W. wanted to be with both parents and had witnessed A.W. showing affection and love to both parents.

¶ 41 The GAL spoke with Sandra Triplett in March 2025. Sandra was going through divorce proceedings with Chris. They co-own four funeral homes. She had concerns regarding Chris living with Jessica because of the children in the home and the pain medication and marijuana he used for pain resulting from a motor vehicle accident.

¶ 42 In February 2025, the GAL spoke with Ashley McCoy, who knew both parties. Ashley utilized Jessica for babysitting her children before she moved to Canton, Illinois. Ashley reported Jessica did a great job caring for her children.

¶ 43 The GAL also spoke with A.W.'s teacher, Natalie McCombs, in March 2025. A.W. was behind in most of her core subjects. She noted A.W. appeared more timely, alert, and spunky at school when Justin was parenting, but she did not note any concerns with either parent.

¶ 44 *2. Other Documentation*

¶ 45 The GAL reviewed "collateral documentation," which mostly consisted of e-mails from Jessica providing updates on A.W. An e-mail from Jessica in October 2024 noted she picked up A.W. from school on a 57-degree day and she was wearing shorts, sandals, and no coat. She was not wearing any socks or underwear.

¶ 46 Another e-mail from October 2024 dealt with a tablet that traveled between the

two households. A.W. forgot the tablet and her blanket at Jessica's house on the day of the exchange. Jessica said she would contact Maggie about it or have B.S take it to school the next day. Justin's sister showed up, unannounced, to retrieve the blanket, but the tablet could not be located. That evening, Jessica received a call from the Fulton County Sheriff's Department regarding the tablet.

¶ 47      A December 2024 e-mail from Jessica noted A.W. brought her cell phone to Jessica's house and refused to turn it over during bedtime, despite the household rules. A.W. called Justin to tell him her leg hurt and that Jessica would not give her medicine. A.W. then knocked on Jessica's door, telling her Justin wanted to speak with her. Justin yelled at Jessica over the phone, and despite her telling him she could not give A.W. any more medicine because it was not time yet, he yelled, "[G]ive my daughter some medicine you stupid fucking cunt."

¶ 48      A March 2025 e-mail from Jesscia noted she was not allowed to see or speak with A.W. on her birthday, despite providing Justin with parenting time so he could have a birthday party with her over the weekend. Justin permitted A.W. to miss school without Jessica's approval, which Jessica found out when she went to surprise A.W. at school and discovered A.W. was absent. A.W. claimed Justin told her she had to keep it a secret. When B.S. called her to wish her a happy birthday, A.W. claimed she answered, but Justin told her to hang up and turn her phone off.

¶ 49      An audio recording between Justin, Jessica, and A.W in May 2025 revealed A.W. called to ask Justin if it was true Jessica had to pay half her phone bill. Justin claimed his attorney told him that if Jessica wanted to contact A.W. on her cell phone, she had to pay half the cost. An argument between the parties ensued, with A.W. repeatedly interrupting the parents. Eventually, when A.W. did not receive a response to what she was saying, she threw a temper

tantrum and pretended to cry.

¶ 50                              3. *Findings and Recommendations*

¶ 51          After her review, the GAL believed a significant change in circumstances occurred that warranted a modification of significant decision-making authority and parenting time as scheduled in the parties' original agreed-upon parenting plan. The parties had been involved in multiple order of protection proceedings, their communication and ability to coparent had diminished, and the parenting plan schedule was not feasible, nor did it provide A.W. with the stability she needed to thrive. Despite Justin's motion to restrict Jessica's parenting time, the GAL did not believe that to be an appropriate remedy in this situation. She did not find evidence supporting the contention Jessica engaged in behavior that endangered the child mentally, physically, or morally. After weighing and explaining the factors, she determined Justin and Jesscia should have joint decision-making authority for education, healthcare, religious affiliation, and extracurricular activities, which would be limited only in specific circumstances that she outlined. She also recommended Jessica be named the parent with the majority of the parenting time during the school year, with Justin receiving parenting time on alternating weekends and two evenings during the week. She did not believe it was in A.W.'s best interest to be bounced around households based on Justin's work schedule. During the summer months, she recommended the parties share equal parenting time.

¶ 52                              E. The Hearing on Justin's Motion

¶ 53          The foregoing proceedings involving the parties were consolidated. The hearing on the motions spanned over three days. What follows is a summary of the testimony pertinent to the issues raised on appeal.

¶ 54                              1. *The GAL*

¶ 55 The testimony of the GAL was consistent with her report. (To avoid unnecessary repetition, we do not discuss her testimony in detail here.) It was her opinion modification of parenting time in favor of Jessica was preferential due to concerns regarding the "back and forth between the parties and other third parties" and Justin being unable to transport A.W. to school himself in the mornings due to his work schedule.

¶ 56 In response to the trial court's inquiry, the GAL noted the parties did not get along, "not even a little bit," and "[t]hey don't even have each other's phone numbers." Because of the high level of hostility between the parties, she considered whether it was best to give one parent sole decision-making responsibility. However, she believed both parents made decisions that were in the child's best interest, and therefore, it was acceptable for the parents to have joint decision-making in part.

¶ 57 On cross-examination, the GAL noted A.W. was a sweet girl but manipulative, in that she got "torn in a lot of different directions of who she wants to please" and was "very aware of who she is with and what to say to make them happy." Both parties contributed financially to care for their child. A.W. loved both her parents but would say things that may or may not be true if she was not happy in any given situation. A primary concern expressed by the GAL was Justin's interference with telephone communication between Jessica and A.W. Specifically, she noted a text where Justin stated, " 'It's not my problem your mom doesn't have any money. She needs to figure it out herself,' " in response to not wanting A.W. to call or text Jessica from the cell phone he had purchased for her. The GAL also had concerns regarding A.W. bouncing between the parents and other third parties who helped Justin due to his work schedule. She believed Jessica had more flexibility in caring for A.W., including overnight visits and transporting her to school, whereas Justin was not able take A.W. to school unless he had the day

- 13 -

off.

¶ 58    She did not believe A.W. was mature enough to make decisions regarding her parenting time. When asked why she felt uncomfortable at Jessica's home, A.W. gave only vague answers without specific examples. She also believed A.W.'s bruising that had been brought to the trial court's attention through exhibits looked like what a child would normally encounter through everyday life. In conclusion, she still believed the recommendations she made in her report were in A.W.'s best interest.

¶ 59                                2. *Maggie*

¶ 60    Maggie noted she was the "phone go-between" for Jessica and Justin after an order or protection was put into place because they could not get the parenting app to work. She had often cared for A.W. during parenting time for both parties. In the summer of 2024, she cared for A.W. during both Jessica's and Justin's parenting time, filling in due to Jessica working and Justin's early work hours. Starting January 2025, A.W.'s grandmother began staying at Justin's house so A.W. could avoid waking up early or spending the night at Maggie's before school.

¶ 61    Maggie had taken photographs of A.W. depicting some bruising, rashes, and colored markings after A.W. had come back from being with Jessica. Several images depicting the bruising, rashes, and markings were admitted. A.W. said Chris grabbed her. On another occasion, A.W. told Maggie she was not supposed to tell Maggie anything and that she fell down the stairs. Maggie noted one of the rashes ended up being an allergic reaction and another rash was from when A.W. had "Fifth's [*sic*] Disease." She did not think the current parenting plan provided stability for A.W.

¶ 62                                3. *Sandra*

¶ 63 Sandra had concerns she disclosed to the GAL after learning about an alleged incident where A.W. had seen Jessica and Chris in a sexual position. She noted an incident where her children had witnessed her and Chris in a sexual position when they were still married. Sandra was adamant she did not want her children to see her and Chris like that again, but Chris did not think it was an issue.

¶ 64 Sandra met Justin for the first time in November 2024, after receiving messages suggesting Chris was involved with an employee. Justin also shared photos showing Chris's car parked outside Jessica's house and expressed his frustrations about the situation to her.

¶ 65                                     4. *Rochelle Briney*

¶ 66 Rochelle Briney is a licensed clinical social worker. She provided outpatient cognitive behavioral therapy to A.W. to cope with transitions and emotional regulation at the request of Justin. At the time of the hearings, she had only provided care for A.W. for a month. A.W. told her that she did not want her time with her mother to increase. A.W. mentioned concerns regarding access to food at Jessica's house, asserting there was food in the morning but not necessarily throughout the day. A.W. also claimed Jessica and Chris used marijuana in the home. A.W. claimed Jessica's house was chaotic, with a lot of yelling, and she would get scared. Sometimes she would get into a physical back-and-forth with her foster sister, A.C. Briney noted children can embellish stories, and it seemed like A.W. had a bit of a strained relationship with Jessica.

¶ 67 Briney had never contacted Jessica or tried to get in touch with her. Her recommendation for Jessica to have limited time with A.W. was based solely on information provided by A.W. The report of proceedings shows the report authored by Briney was admitted into evidence over objection. However, no report appears in the record.

¶ 68                              5. *Justin*

¶ 69          Justin testified to an instance where A.W. was not picked up from school when it was Jessica's parenting time. Justin received a call from the school when he was at work and unable to answer the phone. Jessica never provided an explanation as to why it occurred.

¶ 70          Justin had concerns regarding bruises he saw on A.W.'s body, in addition to sexual acts A.W. recounted, which involved her seeing Jessica and Chris in bed, with Jessica on top of him. Justin denied ever asking A.W. to fabricate any statements.

¶ 71                              6. *Jessica*

¶ 72          Jessica testified she had been investigated by DCFS twice at the prompting of Justin. The allegations leading to investigations were unfounded. She denied ever having engaged in sexual acts in front of A.W. or any of her other children.

¶ 73          When Jessica and A.W. were spending time together one-on-one, everything was great. Sometimes, however, A.W. would get into altercations with the other children, including situations where A.W. would hit or bite the other children. A.W. had a temper and would get "brutal at times if [she did] not get her way." Jessica suggested counseling for A.W. to address any mental health issues, but Justin deemed it was unnecessary. Later, Jessica learned Justin had arranged counseling for A.W.

¶ 74          Jessica proposed A.W. stay with her for the majority of the parenting time to provide stability. She believed Justin should still get equal parenting time in the summer, every other weekend during the school year, and more holiday and break time. She noticed when A.W. returned to her home on the current parenting schedule, it would take her some time to adjust.

¶ 75          During cross-examination, Jessica was asked if she knew the source of A.W.'s bruises shown in the exhibits. Jessica noted A.W. was clumsy, like herself, but was not aware of

how exactly A.W. got the bruises. She also believed Justin may have had a role in manipulating A.W. into making statements regarding the bruises and sometimes A.W. would make inaccurate statements.

¶ 76                                   7. *In Camera Interview of A.W.*

¶ 77          A.W. told the trial court she was accustomed to the alternating schedule with her parents and enjoyed spending time with both. She liked them equally, cooked with each, and appreciated that they both bought her things.

¶ 78          In terms of discipline, A.W. said Jessica would ask her why she engaged in certain behaviors and if she did something "really bad," she would smack her in the face, but "not that hard." At Justin's house, discipline consisted of time outs, and if he was really angry, he would yell, though she stated it only happened one time. She also noted Justin would buy her things, like her tablet, after the old one broke.

¶ 79          She clarified she did not see Chris and Jessica doing anything other than kissing or touching each other's shoulders or arms, nor did she sleep in their room.

¶ 80                            F. The Trial Court's Opinion and Order

¶ 81          At the end of the three-day hearing and prior to making its ruling, the trial court ordered the parties to submit written closing arguments. The court's order noted it considered the testimony of the witnesses at the hearing, the two written reports authored by the GAL, the *in camera* interview of A.W., and the exhibits filed by the parties. The court examined each requirement set forth in the applicable statues involved in modification, decision-making, parenting time, and restriction on parenting time and considered the testimony of the witnesses, determined their credibility, and applied the testimony to the factors required in the statutes. The court found A.W. to be a sweet and well-spoken child, who had tendencies to be manipulative

and could be subject to suggestion as to what to say or do. The court also found both parties had a difficult time communicating with each other and did not like each other, but both love and care for A.W. However, it determined Jessica's testimony to be more credible.

¶ 82    The trial court concluded there was a substantial change in circumstances with A.W. that warranted a modification of the significant decision-making authority and parenting time schedule set forth in the parties' parenting plan. The court did not find that Jessica had engaged in conduct that seriously endangered A.W.'s mental, moral, or physical health or that significantly impaired her development; thus, a restriction on her decision-making authority or parenting time was not warranted. Instead, a modification of parenting time in favor of Jessica was necessary to facilitate the stability of A.W. and her environment. Justin would have parenting time with A.W. on alternating weekends and every Tuesday and Wednesday until 7 p.m. The court also determined the parties would share equal parenting time during the summer months, A.W. would be allowed to use her phone to speak with either parent during each parent's parenting time, and A.W.'s social media accounts would be made private and require parent authorization for certain actions. The court ordered joint decision-making authority for A.W.'s education, health, religious affiliation, and extracurricular activities and specified the details in the order.

¶ 83    This appeal followed.

¶ 84                                II. ANALYSIS

¶ 85    Justin levies two arguments in appealing the trial court's judgment. First, he argues the ruling was against the manifest weight of the evidence, particularly the court's decision to allocate the majority of parenting time to Jessica. Secondly, he argues it was improper for the court to modify his parenting time in the absence of a petition filed by Jessica

requesting a modification. We disagree and affirm.

¶ 86                               A. Decision to Modify Parenting Time

¶ 87          The Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/101

*et seq.* (West 2024)) governs litigation involving the allocation or modification of parental

responsibilities, including parenting time.

¶ 88          Section 610.5 of the Act (750 ILCS 5/610.5(a) (West 2024)) governs

modifications to parenting plans. Section 610.5(a) of the Act provides, "Parenting time may be

modified at any time, without a showing of serious endangerment, upon a showing of changed

circumstances that necessitates modification to serve the best interests of the child." 750 ILCS

5/610.5(a) (West 2024). "Accordingly, modification of [parenting time] is warranted only if

there has been: (1) a change of circumstances and (2) modification is necessary to serve the best

interests of the child." *In re Marriage of Debra N.*, 2013 IL App (1st) 122145, ¶ 47. When

evaluating a child's best interest for the purposes of determining parenting time, the trial court

should consider the factors outlined in section 602.7(b) of the Act (750 ILCS 5/602.7(b) (West

2024)). The factors include:

> "(1) the wishes of each parent seeking parenting time;
>
> (2) the wishes of the child ***;
>
> (3) the amount of time each parent spent performing
> caretaking functions with respect to the child in the 24 months
> preceding the filing of any petition for allocation for parental
> responsibilities ***;
>
> (4) any prior agreement or course of conduct between the
> parents relating to caretaking functions with respect to the child;

(5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests;

(6) the child's adjustment to his or her home, school, and community;

(7) the mental and physical health of all individuals involved;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on parenting time is appropriate;

(11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household;

(12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs;

(13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(14) the occurrence of abuse against the child or other member of the child's household;

(15) whether one of the parents is a convicted sex offender

\*\*\*;

(16) the term of a parent's military family-care plan \*\*\*

and;

(17) any other factor that the court expressly finds to be

relevant." *Id.*

¶ 89    Here, there is no dispute as to whether a change in circumstances occurred. Therefore, the only issue before us is whether modification of the parenting plan was in the best interest of A.W.

¶ 90    We review the trial court's allocation of parenting time under the manifest-weight-of-the-evidence standard. *In re Marriage of Rogers*, 2015 IL App (4th) 140765, ¶ 62. The evidence is against the manifest weight of the evidence when it is unreasonable, arbitrary, or not based on the evidence, or when the opposite conclusion is apparent. *Vaughn v. City of Carbondale*, 2016 IL 119181, ¶ 23.

¶ 91    Justin claims because A.W.'s school teacher testified A.W. is more timely, alert, and spunky at school during his parenting time, the trial court's decision to award Jessica the majority of parenting time is against the manifest weight of the evidence. He further contends that because he was allocated equal parenting time during the summer, it follows that he should be allowed the same parenting time during the school year.

¶ 92    The record reveals the trial court was presented with a substantial amount of evidence from both sides during a hearing that spanned over multiple days. Testimony from Justin, Jessica, Maggie, the GAL, and A.W. established during Justin's parenting time, A.W. was shuffled between Maggie or other babysitters who would care for her in the early morning hours

due to Justin's work schedule. This meant A.W. spent a large portion of Justin's parenting time with third-party caregivers, particularly during the morning hours before school, which the court determined to be disruptive. In addition, although A.W. mentioned wanting to spend equal time with her parents, the court noted she complained about being bounced back and forth on a frequent basis. The court also determined, by clear and convincing evidence, Justin had manipulated A.W., tried to buy her love with gifts, asked A.W. to be secretive about events he did not want Jessica to know about, and attempted to alienate A.W. from Jessica by not allowing her to contact her on the phone he bought. The court found Jessica's testimony to be more credible than Justin's, particularly in relation to events that took place while A.W. was in her care. We give great deference to a trial court's best-interest finding because it sits in the best position to observe the parties and assess witnesses' credibility. *In re Marriage of Stopher*, 328 Ill. App. 3d 1037, 1041 (2002). Our function is not to reweigh the evidence or set aside the trial court's ruling simply because a different conclusion could have been drawn from the evidence. *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 51.

¶ 93      Moreover, while Justin requests this court order a week-on, week-off schedule, "courts have traditionally viewed 50/50 joint parenting time with caution." *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 47. This is even more true where the parties have "too much animosity to be able to cooperate." *Id.* The evidence here shows the parties were unable to communicate effectively with each other, and although each had a strong relationship with A.W., "[a] 50/50 arrangement is not a substitute for making a difficult choice between two good parents." *Id.* ¶ 52.

¶ 94      Under these circumstances, the trial court's decision to modify parenting time was not against the manifest weight of the evidence because its findings are not unreasonable or

arbitrary, nor was the opposite conclusion readily apparent. The court's order provides consistency and stability for A.W., which was otherwise lacking in her constant shuffle between homes, accounts for the needs of her daily schedule, and considers the interaction and interrelationship of A.W. with her parents, siblings, and other family members who care for her.

¶ 95                                    B. Lack of a Counterclaim from Jessica

¶ 96        Secondly, Justin argues because the case was before the trial court on *his* motion to modify parenting time, the court's decision to modify parenting time more favorably to Jessica was improper. In support, he points to cases that have held relief could not properly be granted to a responding party who did not file a "counterclaim." We find those cases inapplicable to the issue at hand and Justin's reliance upon them unconvincing.

¶ 97        As previously stated, the Act governs litigation involving the allocation or modification of parental responsibilities and parenting time. See 750 ILCS 5/602.7, 610.5 (West 2024). An issue involving the interpretation of a provision of the Act presents a question of law, which we review *de novo*. *In re Marriage of O'Hare*, 2017 IL App (4th) 170091, ¶ 15.

¶ 98        Section 610.5(a) of the Act provides, "Parenting time may be modified at any time, without a showing of serious endangerment, upon a showing of changed circumstances that necessitates modification to serve the best interests of the child." 750 ILCS 5/610.5(a) (West 2024). The Act further provides,

>        "[T]he court shall modify a parenting plan or allocation judgment
>        when necessary to serve the child's best interests if the court finds,
>        by a preponderance of the evidence, that on the basis of facts that
>        have arisen since the entry of the existing parenting plan or
>        allocation judgment or were not anticipated therein, a substantial

change has occurred in the circumstances of the child or of either parent and that a modification is necessary to serve the child's best interests." *Id.* § 610.5(c).

In this case, it is undisputed a modification was warranted due to a substantial change in circumstances. As such, the trial court was tasked with allocating parenting time according to the child's best interest. *Id.* § 602.7(a). Justin's pleading properly brought the issue before the court, and the court made its decision to modify parenting time based on proper statutory considerations. Therefore, no error occurred.

¶ 99                                III. CONCLUSION

¶ 100        For the reasons stated, we affirm the trial court's judgment.

¶ 101        Affirmed.